## SIMPER v. SCORUP

No. 5068.   Decided July 31, 1931. · (1 Pac. [2d] 941.)

*P. G. Ellis* and *J. H. McKnight,* both of Salt Lake City, for appellant.

*Gustin & Pence,* of Salt Lake City, for respondent.

STRAUP, J.

This case, under the title *Simper* v. *Brown et al.,* was here before. 74 U. 178, 278 P. 529. The parties, Simper v. Scorup, on this appeal are the same and only parties as on the first appeal. On the prior appeal Scorup appealed from a judgment against him and in favor of Simper in the sum of $4,500. That judgment, for reasons stated in the former opinion, was reversed and the case remanded for a new trial. A retrial before the court resulted in a judgment in favor of Scorup, no cause of action, from which Simper appeals. He complains of the findings and conclusions and the judgment based upon them.

The main transactions out of which the controversy between Scorup and Simper arose are disclosed by the former opinion. In such respect there is no substantial difference between the records on both appeals. Briefly stated, the Salina Co-operative Mercantile Institution, a corporation, on February 1, 1919, was and prior thereto had been en-

gaged in a mercantile business at Salina, Utah. Its then outstanding capital stock consisted of 4,748.5 shares, of which Wm. H. Brown was the holder of 2,919.5 or 2,929.5 shares, Scorup 663.5, Simper 290.5. The remaining shares were held by about 27 other shareholders in amounts from a few shares to 147 shares. On or about February 1, 1919, the stockholders of the corporation by mutual agreement agreed to dissolve the corporation and to divide or distribute the assets of the corporation among the stockholders, and in accordance with such agreement, the corporation by order of court was dissolved. A portion of the assets of the corporation was transferred and conveyed to Brown in lieu of the shares held by him, which was a majority of the outstanding capital stock. The remaining assets, consisting of a store building, the real estate upon which it stood, store fixtures, and a stock of merchandise, were conveyed and transferred to Scorup as and for the distributive shares of the remaining about 1,829 shares, of which Scorup held 663.5, Simper 290.5, and the rest by about 27 other shareholders. On February 6, 1919, Scorup by written statement notified all of the shareholders (except Brown) that a division of the assets of the corporation had been made and that "your committee has designated me as temporary manager inasmuch as I was the largest stockholder" (of the group holding the 1,829 shares), and furnished them a statement of the assets of the corporation distributed among the group of 1,829 shareholders, consisting, as he stated, of "building and grounds $2,500, store fixtures $1,269, merchandise taken at wholesale $21,680, total assets of $25,449." Against that he stated "liabilities, $6,113.31 due for merchandise and $2,600 borrowed money," or a "total liabilities of $8,713.31." In such statement he further stated that at least $5,000 would have to be borrowed immediately to pay accounts past due and to meet expenses; that as he was the largest stockholder he would "have to assume the big end of the responsibility," and offered to purchase all of the shares of the other stockholders of the 1,829 group at $2.50 a share and notified them that a meet-

ing would be held February 10th and requested all to be present. All attended the meeting except the plaintiff. At such meeting all the assets of the corporation distributed to the 1,829 group of shareholders were turned over to Scorup and the real estate conveyed to him in fee. He immediately took over the exclusive management of the business and carried it on as though it were his own business from thence on until a fire occurred in May, 1923, which completely destroyed the building, all the fixtures, and the whole stock of merchandise on hand. At about the time he took over the business, Scorup purchased all of the shares of the 1,829 group of stockholders, except the 290½ shares held by the plaintiff and about 107 shares held by another.

The plaintiff testified, and the court found, that the plaintiff had not consented to turning his interest over to Scorup; but the court further found that the plaintiff knew that his interest was taken over by Scorup and that he was carrying on the business, without any objection or protest on the part of the plaintiff, and that Scorup held plaintiff's interest with the plaintiff's knowledge and acquiescence in trust and for the use and benefit of the plaintiff.

It was shown without dispute, and so in effect was testified to by the defendant and so found by the court, that Scorup, from the time he took possession of the business and until the fire, exclusively managed the business as though it were his own, bought and sold goods, borrowed money, and carried on and conducted the business, without consulting the plaintiff or any one and without rendering any account or making any report, or in any way acquainting the plaintiff with the business or with what was being done, notwithstanding during all that time the plaintiff lived at the same place where the business was conducted. Neither did the plaintiff request any statement or report or an accounting, but on two occasions prior to July 1922, he sent his wife to the defendant, who requested him to buy Simper's shares of stock. Scorup declined to pay cash for the stock, but stated he would purchase it at $2.50 a share,

if the plaintiff would take it out in trade, which the wife declined to accept, stating she and her husband could not use that amount of merchandise which consisted wholly of dry goods.

Thereupon in July, 1922, this action was commenced. As stated on the former appeal, the purport of the complaint was not clear, whether on the theory of a conversion or for an accounting; but the answer filed by Scorup proceeded on the theory of a trust relation between the plaintiff and Scorup, that the interest of the plaintiff and of all other shareholders of the dissolved corporation (except Brown) in and to the assets of the corporation (not transferred to Brown) were conveyed and transferred to Scorup as the agent and representative of the group of 1,829 shareholders, to carry on and manage the business of the dissolved corporation and for their use and benefit, from which we in the former opinion held that the law implied a duty on the part of Scorup to account to the plaintiff for his interest in the business carried on by Scorup, and that on the record it was clear that Scorup was in duty bound to render to the plaintiff a complete and true accounting. The judgment, however, was reversed and the case remanded for a new trial largely because of a failure of findings as to many of the material and necessary issues and for other reasons indicated in the former opinion.

When the action was commenced in July, 1922, Scorup, until the fire, continued to carry on the business as theretofore, without attempting or offering to make any accounting whatever. The building and stock of merchandise were covered by insurance policies of over $26,000. Without consultation with the plaintiff or any one, Scorup settled the loss for $20,500, which amount was paid him by the insurance companies. Without consultation with the plaintiff or with any one, Scorup rebuilt the building at a cost, as he testified, of about $7,000, and without consultation with the plaintiff or any one, sold the building and real estate upon which it stood for the sum of $9,000. Out of the $20,500 received by him on the insurance policies and

$2,000 for the sale of the lot, or a total of $22,500, Scorup without consultation with the plaintiff or with any one, paid, as he testified, "approximately" $4,000 on what he claimed were indebtedness against the store, and applied the balance, amounting to about $18,500, on what he claimed was owing him for moneys advanced in carrying on the business. On neither the first nor on the second trial (the case was tried three times) did Scorup offer any accounting and made no attempt to do so, claiming that he had advanced $34,000 in carrying on the business, the greater part of which he claimed had not been repaid and that the plaintiff was indebted to him for plaintiff's pro rata share of such unpaid loans or advances.

On a reversal of the judgment on the prior appeal, Scorup amended his answer and attached thereto a statement showing the amount of monthly "store receipts," monthly "store expenditures," and "loans" made by him to the store, from and including February, 1919, until May 1, 1923, when the fire occurred, which aggregated, as he stated, "$134,109.37 as total receipts from sales in store, $31,560 loans or advances" made by him in carrying on the business, "$20,500 insurance received on account of the fire," and "$2,000 received from the sale of lot," or a "total receipts of $188,-169.37." Against that he stated monthly "store expenditures" aggregating "$173,225.69," and "$16,500 on account of loans advanced," or "a total expenditure of $189,725.69," leaving "a debit balance of $1,556.32," paid by him, which, together with a "balance due him of $15,060 on account of loans," made a "total of $16,616.32 due him on account of advances."

Such statement in the main was adopted by the trial court, finding the receipts, including sales of merchandise, moneys recovered on the insurance policies and on the sale of the lot, to be $156,609.37, the total expenditures to be $163,665, and $26,060 (instead of $31,560) loaned or advanced by Scorup in carrying on the business. But the court did not find how much nor what part of such loans of $26,060 was repaid. The only finding made in such

respect was that "on account of the fire which destroyed the building and the merchandise the business failed and the plaintiff and Scorup both lost their investments therein, and in addition thereto, Scorup lost considerable part of the money which he had advanced to conduct and carry on the business." Scorup, however, by his statement admitted that of the loans or advances made by him he was repaid $16,500, which deducted from $26,060, the amount found by the court advanced by him, left a balance due him for money loaned or advanced of $9,560, instead of $15,060.

The principal assignments raise questions concerning the accounting and the character of it, and since the accounting related to transactions and dealing wholly and peculiarly within the knowledge of Scorup, it is contended that the accounting was insufficient and unsatisfactory. When Scorup took over the business, he opened a bank account in the name of "Salina Cash Store," which was a mere name selected by him for convenience and which was his own personal account, carried that way, as he testified, to designate it from his other individual account carried by him in his own name at the same bank. He testified that all of the receipts of the business from the store were daily deposited in the bank in the name of the "Salina Cash Store" and all disbursements made therefrom were made by checks drawn by him in the name of the "Salina Cash Store." He testified that his books and returned checks and all records relating to the business were destroyed by the fire, and hence was unable to produce any books or writings or documents of any kind showing the daily or other receipts from the store, or as to the expenditures or disbursements, or as to moneys loaned, or as to anything relating to the business carried on and conducted by him. He gave no testimony as to the character of the books destroyed by the fire, nor as to the manner in which they were kept, nor as to the nature or character of entries made therein, nor as to the matters and things entered in the books, except as stated by him, the loans made by him were noted in a ledger; but so far as the books were concerned,

he was unable to or did not state or give any details or explanation of the business in any particular. He, however, was able to produce and did produce the bank statements of the account carried in the name of Salina Cash Store, which showed the daily deposits made, the date and amount of checks drawn against the account and the daily balance of moneys on hand, which bank statements included the $20,500 paid him on account of the fire. It was wholly upon such bank statements that the report made by Scorup and attached to his answer was based. Outside of the deposit of $20,500 received on account of the fire, the bank statements show about fourteen deposits at different times of over $1,000 to $4,000 each, aggregating over $34,000. All of such deposits of $1,000 and over were pointed to by Scorup as indicating moneys loaned or advanced by him or notes given in the name of the Salina Cash Store and indorsed by him, and which, as he testified, were afterwards paid by him. But there is not anything on the face of such bank statements to indicate that, or to indicate the source of such deposits, nor as to the source of any of the deposits. There were a number of deposits from $400 to $500 and over, and numerous daily deposits of smaller amounts. Scorup testified that the daily store receipts from the sale of goods averaged about $100. On the other hand, the bank statements show about eleven checks issued at different times against the account of the Salina Cash Store, from $2,000 to over $3,500, aggregating about $27,000, about 21 checks issued of $1,000 or more and less than $2,000, numerous smaller checks from several hundred dollars to $800 and $900, and numerous almost daily checks of less amounts. But, again, there is not anything to indicate on the face of the statements as to whom, or for what purpose, such checks were drawn or issued. No explanation was given by Scorup as to whom or for what purpose any of the checks were made. In the absence of his books and records, we would not expect him to be able to identify even all of the larger checks, and certainly not many of the smaller checks; yet it is not unreasonable to

expect his ability to have shown for what purpose and to whom some of the larger checks were issued, whether for goods purchased or otherwise. No evidence was given by him to show or even to estimate the daily or monthly expenses of the store, nor in any manner to explain any part of his accounting, except by pointing to the larger deposits and claiming them to be sources of money advanced by him or notes given and paid by him in carrying on the business.

Otherwise he offered no other explanation of the accounting rendered by him. He testified that after the fire he paid approximately $4,000 of an indebtedness against the store. He produced no receipts or vouchers or any statement as to that, nor did he give any testimony to show to whom or the amount paid to any debtor or debtors. If he had taken no receipts or vouchers, we again would not expect him to be able to testify in detail as to all whom such indebtedness was paid, nor as to the amount paid to each debtor. But we would expect him to be able to state at least approximately the amount of indebtedness paid to some of such debtors or claimants and what the indebtedness was for. Such indebtedness was not enumerated in his accounting or there claimed to have existed or as having been paid by him. He testified that in carrying on the business he purchased goods, but offered no testimony to show from whom he purchased any of them, nor when or the amount purchased at any time. Again, in the absence of his books and records, we would not expect him to be able to testify in detail as to such matters; yet it is not unreasonable to expect his ability to testify as to some of such purchases, from whom goods were purchased and approximately the amount or amounts as to some of them.

This case for reasons, among others, was remanded for a new trial in order that Scorup might render as full and as complete an accounting as he was capable of rendering. Because of the destruction of his books and records, we well appreciate the difficulty of rendering an accounting in detail. When this suit was commenced, nine or ten months before the fire, he then knew that an accounting

was required of him. He made no attempt to render any. He went on as he did before, conducting the business without consulting the plaintiff and carried it on as though it were his own business and as though the plaintiff had no interest in it, and when the fire occurred settled the loss without consulting the plaintiff and as though he had no interest whatever in the business, and, without rendering any accounting or attempting to do so, appropriated the whole of the proceeds derived from the loss by fire to his own use. Not until after this suit was commenced, and until he filed his answer, had he made any claim to the plaintiff or to any one, that he had loaned or had advanced any moneys to carry on the business. When he took it over, he admittedly received merchandise at wholesale values amounting to over $21,000. He testified that the first two years, 1919 and 1920, were good years and prices good. Yet, according to his statement he claimed he loaned the business the first year $19,500 to carry it on, that he loaned the business $8,560 the second year, $3,000 the third year, and $500 the fourth year, or a total of $31,560. Notwithstanding the first year was a good year, yet according to the accounting rendered by him, his "store expenditures" exceeded his "store receipts" by $22,209; the second year his store expenditures exceeded his store receipts by $11,-207; the third year about $4,000; the fourth year, which he testified was a poor year, his store receipts exceeded his store expenditures by something over $200; and the fifth or last year, up to the time of the fire, his store expenditures exceeded his store receipts about $2,500. During all that time not anything was said by him to the plaintiff of the condition of the business, or that it was being conducted at a loss, until the filing of his answer. No effort was made by him to explain why the first year it was necessary to advance $19,500 in carrying on the business or $8,560 the second year, whether to purchase goods, pay debts or otherwise, or why it became necessary to make such advances.

By the accounting made by him based upon the bank statements, after deducting the moneys loaned or advanced

by him, the moneys received on account of the fire, and on the sale of the lot, he reported that "the total receipts from sales in the store were $134,109.37"; but considering, as he testified, that all receipts were deposited in the bank, and on calculating the total deposits as appears by the bank statements and excluding the moneys loaned or advanced by him, the insurance received on account of the fire, and the moneys received on the sale of the lot, the bank statements show his receipts from sales of the store to be over $147,400, or over $13,500 more than stated by him in his accounting.

There is no doubt that from time to time Scorup bought additional goods to replenish the store. The amount thereof, or whatever loss if any was incurred thereby, is uncertain and cannot even be approximated. There is no doubt Scorup advanced or loaned some moneys to carry on the business. The court found that to be $26,060. That finding is based upon testimony that the larger deposits made in the bank were from sources or moneys advanced or notes given and paid by Scorup. The amount of that is uncertain. It still is more uncertain as to how much of such loans or advances was repaid. According to the accounting made by Scorup, there still was due him $15,060 on account of loans. If as found by the court the total loans were $26,060, and if, as admitted and reported by Scorup, he had been repaid $16,500 on account of loans, there was due him only $9,560, instead of $15,060 as claimed by him in his accounting.

In addition to the store business carried on by Scorup during the period in question, he to quite a large extent also was engaged in the cattle and sheep business. He also put in evidence bank statements of his personal account carried in his own name from February 3, 1919, to and including August, 1924. The statements show a rather active and large account of almost daily deposits, some at different times of over $5,000 to $11,000 and $13,000 each, a number from $3,000, $4,000, and $5,000 each, and numerous deposits of $2,000 and less; and an active and almost daily

checking by him against the account, a number of checks from $2,500 to $9,000 each, a number of $2,000 and less, and numerous checks of less amounts. It is not possible to trace any of his withdrawals from his personal account to the Salina Cash Store account, nor did he attempt to show what if any of his withdrawals of his individual account went into the Salina Cash Store account.

From the accounting rendered by Scorup and from the bank statements upon which his accounting is wholly based, we do not see how any even reasonably accurate result may be reached as to the value of the relative interests of the parties at the time of the fire. The accounting rendered by him was a mere general statement or accounting with no explanation given of it other than as stated. In a suit in accounting in equity the burden of proof is upon the defendant to account for all money or property of the plaintiff that has come into his hands. He has the burden of showing that he is entitled to credit for moneys charged in his account or as having been paid by him to or for the use of the plaintiff, and the plaintiff does not have the burden of showing that the items charged were improper or that the defendant was not entitled thereto. The defendant as the trustee of the plaintiff was required to show that he had performed his trust and the manner of its performance. He owed that duty because of his confidential relation and because he is presumed to know how he performed his duty. That was the effect of our holding on the prior appeal.

On the record we think the defendant failed to make a sufficient report or accounting. On the record we think the plaintiff is entitled to judgment for some amount. On the accounting we are unable to determine what the amount of judgment in favor of the plaintiff should be. This case has been tried three times. On the first trial, the plaintiff was given judgment for $2,140; on the second, a judgment for $4,500; and on the third, no cause of action. On each trial, the defendant had an opportunity of making as full and as complete an accounting

as he was capable of making. On the first two he failed to make any accounting and made no attempt to do so. On the last he, as indicated, failed to make a proper or sufficient accounting. We are of the opoinion that the judgment rendered by the court below, of no cause of action, is erroneous, and is not supported by the record. We, however, are also of the opinion that this litigation ought to end.

Inasmuch as the defendant in taking over the business ran and conducted it as though it were his own business without consulting or advising with the plaintiff or with any one, and failing to make a satisfactory accounting when required to do so, or one from which the ■ relative rights of the parties at the time of the fire could with reasonable certainty be deduced, we have reached the conclusion that the interest of the plaintiff, for want of a better or more accurate method of arriving at the value of his interest, is best determined by resorting to a method based largely on the value of plaintiff's interest when taken over by the defendant. The court below found the value of such interest at that time to be $2,178.70. That was based by the court on a valuation, as found by the court, of $20,000 on the merchandise when taken over by the defendant, instead of $21,680 as represented and valued at that time by the defendant, and by setting off from the then total assets taken over, $9,500, instead of $8,713.31 as represented by the defendant, as liabilities. Thus, taking the value of the merchandise at $20,000 when taken over by the defendant, and adding to that the "building and grounds at $2,500" and the "fixtures at $1,269," the value put on them by the defendent when taken over, and the court not finding that they were of less value, constituted total assets of $23,769. Deducting $9,500 as liabilities therefrom left net assets of $14,269 to be divided among the group of 1,829 shareholders. The plaintiff holding 290.5 shares, the value of his interest in and to the net assets when taken over by the defendant was $2,266, instead of $2,178, as found by the court. To that the plaintiff is entitled to some interest. He not having requested any accounting or made any de-

mand for any statement of the condition of the business, until he commenced this action, July 28, 1922, we do not allow interest from the time the defendant took over the business, but do allow interest at the legal rate of 8 per cent per annum from the commencement of the action, until the rendition of the judgment, February 3, 1930, a period of seven years and six months, amounting to interest in the sum of $1,359.60, or a total of principal and interest of $3,625.60, for which amount the plaintiff is entitled to judgment to be entered as of February 3, 1930.

The judgment of the court below is therefore reversed, and the case remanded with directions to the court below to enter judgment in favor of the plaintiff as indicated. The plaintiff is allowed his taxable costs incurred in the district court on the first trial and his taxable costs incurred in the court below on the last trial, and in this court on this appeal, except as to his briefs which consist of 190 printed pages including covers. We think them unnecessarily voluminous, and thus allow taxable costs for such briefs of only 100 pages including covers. The defendant is given his taxable costs in the court below on the second trial and in this court on the prior appeal.

CHERRY, C.J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.