**HUGHES TOOL COMPANY (now Summa Corporation), Plaintiff,**

v.

**John H. MEIER et al., Defendant.**

**No. C 71–72.**

United States District Court, D. Utah, C. D.

Dec. 21, 1977.

On Motion to Set Aside Order for Accounting and Motion to Enter Final Judgment March 28, 1978.

Edward W. Clyde, Salt Lake City, Utah, James L. Wadsworth, Las Vegas, Nev., and D. Martin Cook, Los Angeles, Cal., for plaintiff.

Robert Wyshak and Lillian Wyshak, Los Angeles, Cal., for defendant John H. Meier.

C. Jeffrey Thompson, Salt Lake City, Utah, for defendant John R. Suckling.

## MEMORANDUM OPINION IN LIEU OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

### [Under Rule 52(a), F.R.C.P.]

ALDON J. ANDERSON, District Judge.

Briefly, in the case in chief, the plaintiff seeks an accounting, claiming the defendant Meier, its trusted agent, breached that trust in handling the acquisition of certain mining claims, and diverted funds to his own use and that of others. Defendant denies the breach and claims a settlement agreement that he wants enforced.

In the course of moving the case to trial extensive domestic and foreign discovery has been had, and lengthy pretrial proceedings. Numerous motions have been filed, briefed, argued and ruled upon. An early attack was made upon the jurisdiction of the court over the defendants under the Utah long-arm statute. After hearing and argument the court denied the motion. An interlocutory appeal was taken to the Court of Appeals of the Tenth Circuit where the ruling of the trial court was affirmed. A stay of discovery was allowed because of the serious illness of the defendant Hatsis. A further delay was granted to enable the completion of the criminal prosecution of the defendant Meier under an indictment filed in Nevada for alleged tax fraud in connection with failure to report monies involved in the transactions under consideration in this case. This stay was terminated after Mr. Meier failed to appear for prosecution of the matter and his bail was forfeited. Time was given the parties to pursue a settlement effort that had been attempted, but without success. Defendant Meier filed a motion to stay proceedings on the theory that they were in the nature of criminal proceedings, and that in view of Meier's constitutional right to claim the Fifth Amendment as to all inquiries with respect to the matters at hand, and his absence from the United States, the trial could not proceed until the criminal prosecution was concluded. This was denied. An effort was made to appeal this to the Circuit Court by a Petition for Mandamus and then, it is understood, to the United States Supreme Court, but without success for defendant. The matter was further delayed to allow the defendant Suckling to seek clarification from the United States District Court for the Central District of California as to whether or not he was under the ban of its order enjoining him from testifying because of attorney-client privilege governing his relationship with Mr. Meier. This was resolved by a dismissal of the California case in which the order had been entered. This court determined that the presumptive facts about which he had conversations with Mr. Meier made out a prima facie case of conspiracy to commit a fraud or crime, and that under such cir-

cumstances, though Mr. Suckling may not have been aware of this at the time, the conversations with Mr. Meier would not be privileged. He was ordered to testify with respect to the same.

The defendant Meier filed a petition seeking enforcement of a claimed settlement agreement. Numerous motions were filed and argued on this matter. As a result an issue on the same appears in the pretrial order, and a non-jury trial of the claim of settlement was held October 20, 1976, and continuing to October 27, 1976. The court made its ruling denying enforcement of the claimed settlement agreement, stating its findings, and conclusions and order into the record. Immediately thereafter the trial of the case in chief took up, as above noted, on October 27, 1976.

By the time of trial settlements resulting in dismissals and defaults based upon service and failure to answer were accomplished as to all of the defendants, except John H. Meier and John R. Suckling. During trial, after he testified, counsel advised the court that the plaintiff and Suckling had reached a settlement of their differences and the case was dismissed as to him.

The hearing on the claim of fraud upon the court involved the resolution of a motion by plaintiff and defendant Meier, upon agreement with the court, to determine whether a fraud had been perpetrated upon the court in the filing of certain documents by the parties in the case in chief. The plaintiff asked that this determination be made with respect to Exhibits A and B attached to defendant Meier's motion dated November 10, 1976, and filed with the court on or about said date near the conclusion of the evidence of the case in chief. It asked for a change in the pretrial order and a continuance of the trial upon the affidavit of Mr. Wyshak that he hoped to show that the two affidavits of Mr. Hughes, filed in this case, assuring the court of his availability for deposition at the court's order, were forgeries. Exhibits A and B were filed by Mr. Wyshak in support of the motion. The defendant asked for the hearing to have the court determine upon the basis of evidence which his counsel thought was available in the form of exhibits and expert testimony to show that Mr. Hughes had not signed the affidavits referred to. A difficult trial of this matter ensued, with a number of witnesses, many exhibits and highly technical expert testimony. As observed above, a written opinion has been filed in that matter, as a result of which the court determined that the burden to establish the forgery of the Hughes affidavits had not been met. Consequently, they stand in the file for what they purport to be.

*Jurisdiction and Venue*

Jurisdiction was invoked under Title 28, United States Code, Sec. 1332. Plaintiff is and at the time the complaint was filed was a corporation incorporated under the laws of the State of Delaware, and had its principal place of business in the State of Texas. At the time the complaint was filed, defendant John H. Meier was a citizen of the State of New Mexico, and he was residing in Vancouver, British Columbia, Canada. Plaintiff proved more than $10,000 was in controversy. The court finds jurisdiction established.

Process was served on the defendants Meier and Suckling under Utah's long arm statute, U.C.A. Sec. 78–27–22, et seq., (Supp.1971). A motion to quash service and to dismiss was made by each of the said defendants, and denied by this court. That ruling was affirmed by the United States Court of Appeals (Tenth Circuit), in *Hughes Tool Co. v. Meier, et al.*, 486 F.2d 593 (1973). Meier has argued this matter again in his post trial materials, but the ruling stands.

Defendant Meier contends there have been insufficient contacts with the State of Utah to subject him to *in personam* jurisdiction, and the court will deal with this question hereafter as an issue of law and an issue of fact.

Anthony G. Hatsis, Toledo Mining Company, Globe, Incorporated, and Charles W. Adams were named as defendants, but the action has been settled and dismissed as to them. Malaga Investments, Limited was never served. The rest of the named defendants have been served, but have de-

faulted. However, no default judgments have been entered against said other named defendants.

*Plaintiff's Contentions*

(a) That John H. Meier was plaintiff's agent in the acquisition for the plaintiff of mining properties in the State of Nevada; that defendant Meier abandoned his fiduciary duty to the plaintiff and, together with others, sold the mining claims to the plaintiff at increased prices and secretly participated in the redistribution of the money to and for the benefit of defendant Meier and others.

That plaintiff contends as a matter of law defendant Meier had a fiduciary duty to acquire the mining properties for the plaintiff at the lowest available price, and that as a matter of law he breached his fiduciary duty in permitting the properties to be acquired from the long-time owners thereof, in the names of strawmen sellers and in permitting the strawmen sellers to sell the same to the plaintiff at greatly inflated prices. Plaintiff contends that defendant Meier had a duty to account to the plaintiff for all of the monies paid for said properties by the plaintiff, except the real purchase price thereof, and the costs of the escrow and sale, and plaintiff, as a matter of law, will be entitled to a money judgment against defendant Meier for all such funds for which he does not properly account.

(b) That there were five mining claim sales transactions, which were consummated with plaintiff through defendant Meier, in Utah escrows, as follows:

(i) A sale on or about the 24th day of June, 1969, by Anthony G. Hatsis to plaintiff. The purchase price was $850,000, and the escrow agent was Continental Bank & Trust Co. of Salt Lake City, Utah.

(ii) A sale on or about the 15th day of May, 1969, wherein a corporation named CPLD Company was the named purchaser, and Anthony Bogdanich was the named seller. The purchase price was $2,900,000. The actual buyer was the plaintiff, and the $2,900,000 was paid into the escrow by the plaintiff, and in its name.

(iii) A sale on or about September 4, 1969, wherein Leon Belaustegui was named as the seller and plaintiff was named as the buyer. The sale price was $1,500,000.

(iv) A sale on or about October 20, 1969, wherein Leon Belaustegui and Sam Bida were named as sellers, and plaintiff was the buyer. The purchase price was $1,900,000.

(v) A sale on or about December 2, 1969, wherein Globe Minerals, Inc. was named as seller and plaintiff was named as buyer. The purchase price was $1,400,000.

(c) That except as to the properties wherein Anthony Bogdanich was the named seller, the mining properties sold under the above-identified transactions were acquired by the named strawmen sellers simultaneously with or shortly before the sale of said properties to the plaintiff; that the price at which the properties were optioned to the named sellers by the previous or long-time owners was a relatively low price. The price was then increased, and the properties were sold to the plaintiff through defendant Meier. The named sellers in the above-identified sales to the plaintiff received a fixed and pre-agreed fee for a small portion of the sales price, and the remainder of the proceeds were redistributed by various means to or for the use and benefit of defendant Meier and others.

(d) Specifically, plaintiff contends that $4,816,976.02 was wrongfully redistributed for the use and benefit of defendant Meier and others, and that of this amount $900,000 was paid to John R. Suckling as attorney for defendant Meier, and the balance was delivered to E. B. VanWalsum and Maatschappij Intermovie and deposited in the Netherlands, in the account of Intermovie. Other sums, in addition to the $4,816,976.02, were diverted from the named sellers, and redistributed to defendant Hatsis, who was acting in concert with defendant Meier. Still other sums were wrongfully paid to strawmen sellers for acting in that capacity.

(e) Plaintiff further contends that defendant John R. Suckling, E. B. VanWalsum, defendant Inrespro, Ltd., defendant Maatschappij Intermovie, defendant Charles W. Adams, Din Van Ruller, the managing director of Maatschappij Intermovie, and Tony In der Reiden, the manager of Inrespro, Ltd., were all working as agents or representatives of defendant John H. Meier, and that the $4,816,976.02 was turned over to said individuals and firms for the use and benefit of defendants Meier and Hatsis, and that the defendant Meier should be ordered to account for all of said money.

(f) That in addition to the money diverted to John R. Suckling, E. B. VanWalsum and Intermovie, as aforesaid, large sums of money were diverted from the strawmen, or named sellers in each of the above transactions, and paid to the defendant Hatsis, who was acting in concert with the defendant Meier, and that defendant Meier should also be required to account for all sums of money redistributed to the defendant Hatsis and others, in addition to the $4,816,976.02 referred to above, including all sums paid to the strawmen sellers.

### Defendant Meier's Contentions

Defendant Meier made a general denial of the allegations of the complaint, and denied any fiduciary relationship, any act of wrongdoing, or any breach of fiduciary duty, and put the plaintiff to plaintiff's proof on each element of plaintiff's case.

The court affirmed its preclusion order of October 19, 1976. Under it defendant Meier was precluded from calling or examining witnesses or offering exhibits, except as the same related to the jurisdictional facts and to his general denial. The court heard at length his claim to enforce a purported settlement agreement.

Defendant Meier refused to produce any documents, refused to make any admissions in response to requests by the plaintiff, and refused to answer questions asked on oral deposition, all on constitutional grounds, claiming the Fifth Amendment.

The court concludes, on the basis of the evidence and for the reasons set forth more fully and explicitly hereinafter, that the plaintiff is entitled to an equitable accounting from the defendant Meier, and that judgment, at the appropriate time, should be entered requiring the defendant Meier to make restitution of any secret profits or benefits he realized in connection with the sale to the plaintiff of the mining claims and the subsequent diversion of the money for purposes other than to serve the interests of the principal.

### Personal Jurisdiction

Before reaching the merits, the court must consider defendant Meier's argument that he had insufficient contacts with the State of Utah to authorize this court, consistent with due process of law, to exercise jurisdiction over his person under the Utah long arm statute, based on notions of fair play and substantial justice.

The United States Supreme Court first enunciated the governing test for personal jurisdiction over non-residents under state long arm statutes in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945):

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316, 66 S.Ct. at 158. Most recently, the Court has analyzed the development of the minimum contacts standard for personal jurisdiction and the subsequent extension of the minimum contacts standard to *in rem* jurisdiction. *See Shaffer v. Heitner*, 433 U.S. 186, 203–204, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683, 45 U.S.L.W. 4849, 4852–56 (1977). The analysis of the minimum contacts standard in *Shaffer* as applied to personal jurisdiction in *International Shoe* focused on whether

> "such contacts of the corporation with the state of the forum as make it *reasonable*, in the context of our federal system of government, to require the corporation to

defend the particular suit which is brought there."

*Id.* at 203, 97 S.Ct. at 2579, *quoting* 326 U.S. at 317, 66 S.Ct. at 158. The court concludes that "reasonableness" depends on a qualitative, rather than a quantitative, analysis of "the relationship among the defendant, the forum, and the litigation." *Id.*

This court has also extensively analyzed the implications of the application of the *International Shoe* minimum contacts standard to personal jurisdiction over non-resident defendants under the state long arm statute. In *Engineered Sports Products v. Brunswick Corp.*, 362 F.Supp. 722 (D.Utah 1973), the court stated that

> [t]raditional notions of fair play and substantial justice require a qualitative analysis of each defendant's contacts with the forum in order to ensure fairness and reasonableness to the defendants and territorial respect for sister states.

*Id.* at 726. *See also Mountain States Sports, Inc. v. Sharman*, 353 F.Supp. 613, 615–16 (D.Utah 1972).

■ The plaintiff contends, and the record supports, that the defendant Meier, or agents acting at his direction and for his benefit, was a key party in a conspiracy implemented in Utah, and had numerous contacts with the State of Utah in connection with the mining claims transactions in issue, even though the claims themselves were located in the State of Nevada. Clearly there was the transaction of business in Utah and the causing of injury by tortious conduct in the jurisdiction. As provided in 78–27–24, Utah Code Ann., 1973, these are events by which a person submits himself to the jurisdiction of the court. In relation to the five sales transactions at issue, which will each be discussed more fully hereinafter, the court makes the following general observations as an overview to personal jurisdiction over the defendant Meier. The defendant Meier or his agents acting at his direction and for his benefit entered the State of Utah on several occasions to negotiate and close Utah escrows on the five transactions. The named sellers in the transactions were either Utah residents or came into the state to negotiate and consummate the agreements. The escrow funds were delivered to a Salt Lake attorney, James P. Cowley, for distribution through agents or intermediaries who acted at Meier's request and for his benefit to divert the money overseas. These agents or intermediaries received the distributions from the escrow funds in Salt Lake City. In light of these general findings on the background to the transactions, the court believes that Meier would have a reasonable basis for knowing that these transactions would have a foreseeable effect upon his amenability to suit in a jurisdiction where substantial sums of money were expended and escrow accounts were opened and closed in the state. The court, after having made these general observations on the effect of the transactions in the State of Utah, will now turn to the specific events that compel the conclusion that defendant Meier had sufficient contact with this State to make it reasonable for the court to exercise jurisdiction over his person.

The specific significant contacts of the defendant Meier or his agents in each of the five transactions are as follows:

### 1. *The Bogdanich Sale—$2,900,000.*

The Memorandum of Agreement, dated May 15, 1969, was made and entered into in Salt Lake City, Utah (Ex. 5—R 446–450) by and between Anthony Bogdanich of Salt Lake City, Utah, as the named seller and CPLD Company, a Nevada corporation, as the named buyer. Joseph M. Foley testified that he was sent to Salt Lake City by John Meier to handle the Bogdanich sale and was present when the agreement was signed by Bogdanich. (R 804, 805.) During the course of arranging the transaction, the problem developed that CPLD, which lacked funds, needed a $5,000 down payment for the sale. Foley called Meier on the phone from Salt Lake City and explained the problem to Meier. Hatsis then said he would advance the $5,000. Mr. Hatsis took the phone and discussed it with Meier and it was "effected." Foley signed the documents in behalf of CPLD. (Exhibit

5, the agreement of sale and Exhibit 6, the escrow agreement.) Foley further testified the 2.9 million for the sale came from Hughes Tool Company through CPLD. Exhibit 103 was received which shows Meier made a request of Hughes Tool Company for payment of the 2.9 million through CPLD. (R 806–808.) Hatsis with defendant Meier's approval on the telephone advanced the $5,000 for the transaction. (R 804, 805.) In following the seller's escrow instructions, attorney James P. Cowley, the Salt Lake City escrow holder, distributed the funds, including a $900,000 cashier's check (Ex. 11) payable to John Suckling that Cowley delivered to Hatsis in Salt Lake City. (R 462.) Although direct testimony is not available due to the assertion of the constitutional privilege, presumably Hatsis delivered the $900,000 cashier's check to Meier since Meier personally delivered the check (Ex. 75) to Suckling in Las Vegas, Nevada. (R 1500.) The evidence that will be discussed hereinafter in relation to the merits clearly establishes defendant Meier's involvement in arranging the Bogdanich transaction through CPLD Company.

### 2. The Hatsis Sale—$850,000.

The memorandum agreement entered into at Salt Lake City, Utah on June 20, 1969, named Anthony G. Hatsis, a Utah resident (R 638), as seller and the plaintiff as buyer. The agreement was signed "Buyer, Hughes Tool Company, by John H. Meier, Hughes Nevada Operations." (Ex. 58.) The transaction was closed through a Utah escrow holder, Continental Bank & Trust Company (Ex. 60), on the basis of an escrow agreement signed by the plaintiff "by John H. Meier, Hughes Nevada Operations." (Ex. 63.) Meier, by letter dated August 7, 1969, still representing himself as acting for Hughes Tool Company, directed the bank to withhold certain funds until a title problem was cleared, and to otherwise distribute the funds. On August 11, 1969, the bank closed the escrow, and after payment of legal and escrow fees a disbursement was paid to Hatsis of $750,915.06. (Ex. 61—R 546.) The accounting of the bank as escrow shows it received $850,000 from Hughes Tool Com-

pany, the sales price to Hatsis. (Intermovie was paid $480,000 from this transaction.) (R 964–6, 997 and 1402.) The evidence establishes that the defendant Meier actively participated in the Hatsis sale, which included numerous Utah contacts of which Meier was aware.

### 3. The Belaustegui Sale—$1,500,000.

An escrow agreement dated September 4, 1969, named Belaustegui, a Nevada resident, as the seller, the plaintiff as the buyer, and Continental Bank of Salt Lake City, Utah, as the escrow agent. The escrow agreement was signed for the plaintiff "by John H. Meier, Hughes Nevada Operations." (Ex. 18—R 473, 493.) All the documents relating to the Belaustegui transaction were executed by Belaustegui in Cowley's Salt Lake City offices. (R 480.) Cowley distributed the escrow funds, including $900,000 that went to VanWalsum (Exs. 23, 29) whose connections with the transfer of funds overseas will be explained more fully hereinafter. At his request $50,000 of the $950,000 was to be paid to Hatsis. (Ex. 23.) His address is shown on the escrow agreement as in care of James P. Cowley, Salt Lake City, Utah. He came to Salt Lake City in connection with this sale three or four times. (R 481.) The bank accounting (Ex. 21) shows the escrow received from plaintiff $1,500,000. The net released to seller was $1,497,262.34. It was turned over to Cowley. He issued checks on this amount. One for $900,000 went to VanWalsum. (Exs. 23 and 29.) The deeds were notarized and executed in the offices of Cowley. Cowley said he was looking after the interest of Belaustegui, (R 503), though not hired by him. Belaustegui said he had not hired Cowley as his attorney, and that he was Hatsis' attorney. (R 691.) Cowley acted as attorney for Hatsis although Hatsis was not named a party to the sales transaction. (R 503.)

### 4. The Bida and Belaustegui Sale— $1,900,000.

An escrow agreement dated October 20, 1969, (Ex. 33—R 502) named Bida and Be-

lausategui as sellers, the plaintiff as buyer, and Continental Bank of Salt Lake City as the escrow agent. The agreement was signed for the plaintiff "by John H. Meier, Hughes Nevada Operations." (Ex. 33.) Bida and Belaustegui came to Salt Lake City for the purpose of signing the agreement in Cowley's offices (R 502), where the deeds were in fact signed and notarized (Exs. 83 and 84—R 645, 646). The bank's accounting (Ex. 36—R 508–510) establishes, and the court so finds, that the plaintiff deposited the agreed amount of 1.9 million. The net amount accounted for and paid to the named sellers was $1,880,843.50. (R 508–510.) The named sellers, in turn, delivered the total net amount to Cowley (R 509) who redistributed the funds according to the written instructions of Bida, Belaustegui, VanWalsum and Hatsis (Ex. 43—R 511). Cowley made checks to Hatsis for $22,270 to repay funds advanced for exercising an option to support the transaction. Further checks for $512,730 and $30,843.50 were given Hatsis. Bida and Belaustegui received a check for $165,000. (R 513–515.) VanWalsum received $1,150,000 in accordance with the instructions. (Exs. 43, 73, 74—R 591, 592.) The role of VanWalsum in acting for the ultimate benefit of Meier to transfer the funds overseas will be detailed hereinafter. VanWalsum directed Cowley to deliver the $1,150,000 to Hatsis. (R 518.) Julia Feist, a Los Angeles attorney, came to Salt Lake City to pick up the $1,150,000 which she delivered to John Suckling. (R 1404, 1405.)

### 5. *Globe Minerals, Inc. Sale.*

This transaction is reflected in an escrow agreement dated December 2, 1969, naming Globe Minerals, Inc. as the seller, plaintiff as buyer, and Continental Bank of Salt Lake City as escrow agent. (Ex. 46.) The escrow was signed in behalf of Globe by Al T. Hays, who resided in Salt Lake City. (R 578.) The bank's accounting showed it received $1,400,000 from plaintiff; that the transaction closed. (Ex. 54.) After discussing with Meier various disbursements, Mr. Suckling sent checks for $57,000 payable to Jackson Mining Company (R 531–534, 1315,

1558); two checks totaling $110,000 to Globe (Ex. 98—R 534, 1315, 1562–3), and a check to Bida and Belaustegui for $38,000 (Ex. 52—R 1562). These checks were sent by letter to Cowley by Suckling. (R 529, 739.) He gave the $57,000 check to Van-Cott, Bagley law firm for Jackson to clear the titles. The named seller received $1,386,976.02 after the close of escrow and gave it to Cowley. (R 532, 535.) Cowley purchased a cashier's check in that amount and delivered it to VanWalsum in Salt Lake City. (R 537, 538.) While a more detailed analysis of VanWalsum's role is made hereinafter, at this point it is sufficient to state that VanWalsum was acting in the State of Utah to transfer the money overseas for the benefit of Meier and Hatsis. (R 1275, 1287, 1702.)

In addition to these transactions conducted either from outside the State of Utah (e. g., signing the escrow agreements in the Hatsis or Belaustegui sales) or through agents coming into the State of Utah, the defendant Meier had come into the State of Utah for purposes of transacting business or aiding in the ongoing negotiations and transfer of monies overseas. Defendant Meier had been to Salt Lake City in February (Ex. 109—R 816) and March (Ex. 108 —R 815) during the period of the negotiations, particularly for the earlier transactions: the Bogdanich and Hatsis sales. When asked of the purpose for his visits during his deposition, the defendant Meier asserted his constitutional privilege not to answer.

The United States Supreme Court recently stated "the prevailing rule" in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by *a party to a civil cause.*'" *Id.* at 318, 96 S.Ct. at 1558, *quoting* 8 *J. Wigmore, Evidence* 439 (McNaughton rev. 1961) (emphasis in original). *Cf. United States v. Parness*, 503 F.2d

430, 437 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). In light of the prevailing rule, the court finds that the plaintiff has produced credible evidence of the personal presence of the defendant Meier in the State of Utah contemporaneously with the transactions in issue, particularly the Bogdanich and Hatsis sales. The court, therefore, draws the adverse inference, in light of defendant Meier's refusal to produce evidence or testify to the contrary in this civil action, that the defendant Meier was personally in the State of Utah to transact business relating to the acquisition of the mining claims.

In addition, John Rix, the comptroller for Toledo Mining Company, testified that he met defendant Meier "[t]wo or three times" in the Toledo offices in 1969 during the time when "Toledo was negotiating the sale of some mining leases to the Hughes Tool Company." (R 1378.) According to the testimony of VanWalsum, the defendant Meier came to Utah on or about February 1, 1970, in a private plane to pick up Hatsis for a trip to the Netherlands Antilles to have a conference with In der Rieden in Curacao about their matters of mutual interest. (R 1285, 1286.)

The foregoing facts clearly establish that the defendant Meier had sufficient minimum contacts with the State of Utah to make it reasonable for the defendant to defend this action in Utah. The defendant had extensive dealings in the State of Utah through those acting on his behalf. Some of those are Utah residents and were co-defendants. He signed the escrow agreements on behalf of the plaintiff fully aware that his dealings were oriented toward Utah and would involve the consummation of agreements with purported Utah sellers and the closing of escrows with Utah escrow agents. The defendant Meier had taken full advantage of using the facilities and banking institutions of the state to transact his business in this state. The notions of fair play and substantial justice are not offended by requiring the defendant to defend this action in the forum where a significant portion of his business activities in relation to the controversial mining claims took place, and where the basic actions of conspiratorial fraud took place. The court, therefore, concludes as a matter of law that the court has in personam jurisdiction over the defendant under the Utah long arm statute.

*Equitable Action for Accounting*

With respect to the claim for accounting, the plaintiff contends that the defendant Meier was a trusted agent of the plaintiff; that in that capacity he had certain fiduciary obligations toward the plaintiff; that by receiving monies from the inflated sales of mining claims through strawmen sellers the defendant Meier breached that duty; and that the defendant Meier must now account for the amounts, if any, he received in breach of his fiduciary obligation and must also account for all money that came into his possession so that the plaintiff can ascertain the amount which was not devoted to furthering the plaintiff's best interests as the defendant Meier was charged to do. If an accounting is ordered by this court, the plaintiff seeks a judgment for restitution of that amount wrongly diverted or otherwise disposed of from the sales to the defendant Meier's benefit.

The defendant has entered a general denial and asserted a defense of settlement which he sought to have enforced. The latter was ruled upon by the court, adversely to the defendant Meier. Meier has at times alluded to the fact that Mr. Hughes approved of his having any money he received. However, he did not file a motion to so amend his answer over the years of the prosecution of this case. As late as September 8, 1976, at the pretrial hearing with the court, Mr. Wyshak for the defendant Meier asserted that the proceeding was like a criminal proceeding and he did not have to show any exhibits or disclose any witnesses. (P. 19 Transcript of Proceedings before the court on September 8, 1976.) On that date Mr. Clyde was complaining to the court that defendant had been informed of plaintiff's witnesses and exhibits, while defendant had not and still refused to advise whether he was admitting he had diverted

the funds but had been given authority by Hughes to keep them, or whether he was standing on his general denial, which his earlier counsel, Mr. Gardiner, had clearly said was his position. Nor had the defendant plead or proposed any other defense or combination thereof, if such there be. At the conclusion of the pretrial hearing the court ordered the defendant's attorney to meet with plaintiff's attorney and work out the problems complained of, state their witnesses and exhibits, and have a pretrial order for the court. Mr. Wyshak made a motion to stay the case, claiming it was like a criminal case and because of defendant's assertion of the Fifth Amendment and his absence out of the country the case could not be tried until the criminal case was disposed of. He filed a supporting memorandum on September 21, 1976. This court denied the motion. On October 15, 1976, he petitioned the Court of Appeals of the Tenth Circuit to mandamus this court to stay the trial. This was denied and the court is informed an effort to have the United States Supreme Court stay the matter was unsuccessful.

On October 19, 1976, the court denied defendant's motion to reconsider a request for further discovery, for jury trial and for stay of proceedings. The court also denied an oral request that the court recuse itself from the trial of the case on the merits.

Mr. Clyde on October 1, 1976, filed his motion for a preclusion order reciting the same complaints and further noting that two attorneys' conferences had been held with defense counsel still declining to disclose witnesses or exhibits he intended to offer. He noted Mr. Wyshak's statement at pretrial that he was going to treat the case as a criminal case and was not disposed to reveal witnesses and exhibits. On October 19, 1976, at the "final pretrial" with the court, the preclusion order was granted, for the reasons argued by plaintiff. When the pretrial order was finally signed, October 27, 1976, and left with the court (not stamped until November 10, 1976), the trial of the settlement phase of the case had been substantially completed. The pretrial order affirmed the preclusion order. The

effect of that order was to preclude the defendant Meier from introducing "surprise" testimony and exhibits on the theory, sometimes advanced by the defendant, that Howard R. Hughes had approved the distribution of the funds to Meier. The defendant Meier was held to introduce only evidence that would support his claimed general denial and enforcement of the claimed settlement agreement.

■ In addition to the court's findings on the jurisdictional facts of the five contested transactions, the plaintiff established a maze of facts leading through the acquisition of the mining claims, the sales thereof to the plaintiff through strawmen sellers, the distribution of the sales proceeds through Cowley, the transfer of funds overseas through VanWalsum and others, and the eventual use of the funds for the benefit of the defendant Meier. Rather than trace the steps of each individual transaction, the court will summarize the steps that are common to each of the transactions. The plaintiff's burden is not, after all, to prove a chain of evidence for the monies allegedly taken by the defalcating agent. Rather, the plaintiff's burden is to prove that the defendant Meier had a fiduciary obligation to the plaintiff, that the defendant breached that obligation by receiving monies through the strawmen sellers that came from the plaintiff, in violation of his obligation to act fairly in the plaintiff's interest, and that the plaintiff has been injured by the defendant's acts.

The defendant contends that he owed no duty to the plaintiff because, in fact, he was employed by Robert A. Maheu & Associates. This position ignores the evidence of his agency for plaintiff and the fact that Meier signed the escrow agreements in the Hatsis, Belaustegui, and Belaustegui-Bida transactions and was extensively involved, as explained hereinabove, on behalf of the plaintiff. As previously noted, defendant Meier signed numerous documents on behalf of the plaintiff in negotiating and consummating these transactions. Among them, in the Hatsis sale, Meier signed an affidavit enti-

tled, "Affidavit of Realty Transferred" (Ex. 100—R 786) and signed as the grantee's "agent," the grantee being the plaintiff herein, and verified the value of the realty transferred in the Hatsis transaction as $850,000. The defendant Meier signed the Request for Disbursement of the sales proceeds in the same amount from the plaintiff to the respective buyers in the Hatsis sale (Ex. 105—R 812), the Belaustegui sale (Ex. 107—R 812, 813), and the Bida & Belaustegui sale (Ex. 104—R 811). The defendant Meier directly acknowledged his authority for plaintiff to acquire claims and negotiated with Joseph Foley to provide a shell corporation (CPLD) that would take title to the mining claims in the Bogdanich sale to avoid publicity that the plaintiff was acquiring the claims. (R 800–01, 1098.) Substantial evidence supports the court's finding that the defendant was self-dealing in violation of his fiduciary duty.

In addition to the facts already noted in the Bogdanich transaction, the defendant Meier personally authorized Foley to let Hatsis advance $5,000 (R 805) as the down payment in the Bogdanich sale. In the Globe Minerals sale, the defendant Meier gave his attorney, John Suckling, authority to approve quite a number of disbursements requested by VanWalsum and which Meier had reviewed with Suckling. Meier also acknowledged to him that he knew the source of the funds was from the transactions for plaintiff in question. (R 1562–1572.)

The court finds that Meier knew of and helped arrange for the transfer of the major portion of the sales proceeds to overseas accounts, investments, and trusts through VanWalsum and Intermovie and other business entities. While the tax laws were such that the defendant Meier could not appear, directly or indirectly, as an owner of these funds, (see R 1411, 1414, 1430), the court finds that Meier undertook to retain practical control over these funds that were ultimately deposited into trust (R 1435–1505) or were placed in the control of other individuals including Gillerion (R 1016–19), the VanWalsum Management Company and in Inriego and Inrespro in the Netherlands Antilles. The fact of Meier's claim to share in the funds that went overseas, from the mining transactions in question, was established by Suckling, who heard Meier and Hatsis reach agreement on an additional payment to be made to Hatsis, with additional stock credits (R 1435–1442) and monies to be divided between Hatsis and Meier as further distributions took place.

■ The court finds the defendant Meier knew or was in a position to know, either personally or through agents acting at his direction and for his benefit, that the mining claims were purchased for relatively nominal consideration and sold to the plaintiff, with Meier acting as plaintiff's agent, at greatly inflated prices.

### 1. The Hatsis Sale.

Anthony Hatsis purchased these claims from Columbia Investment Corporation on June 17, 1969 (Ex. 59) for $25,000 and 30,000 shares of Globe Minerals stock (R 543–44). Three days later these claims were sold through the defendant Meier to the plaintiff by Hatsis for $850,000 (Ex. 58, 60).

### 2. The Bogdanich Sale.

The evidence establishes that most of the claims that eventually were sold through the defendant Meier to the plaintiff were originally sold by Bida and Belaustegui to Bogdanich for consideration of $3,000 per month for 33 months and 100,000 shares of Westland Minerals stock. (Ex. 88.) This consideration was never fully paid for the claims. (R 714–15.) These claims were then sold to the plaintiff, in the corporate shell of CPLD, via the defendant Meier as agent, with Bogdanich as seller, for $2,900,000. (Ex. 5.) Of that consideration, Bogdanich received $150,000. Cowley also disbursed $900,000 of that consideration by check payable to Meier's attorney, John Suckling. (R 1708.) Cowley gave it to Hatsis. (R 471.) The defendant Meier later gave the $900,000 check to Suckling. (R 1500.) $350,000 was paid to Hatsis out of this money to repay a loan of $30,000 to $35,000 gambling debts of Mr. Bogdanich,

and for some stock he never received, although Hatsis was not a party to the transaction. (R 1708–1711.) The court finds that the defendant Meier knew of the vast disparity in the relatively nominal acquisition cost of the claims subsequently sold to the plaintiff for an exorbitant amount in the Bogdanich sale.

3. *The Belaustegui Sale.*

Belaustegui acquired his interest in these mining claims for no consideration (R 676). Belaustegui then assigned his interest to an alleged venture of Hatsis, Belaustegui, and VanWalsum (R 679–80). The escrow agent at the closing of the sale from Belaustegui to the plaintiff gave Belaustegui $1,494,-262.34 as the remaining sales proceeds from the transaction with the plaintiff (R 482, 483). Belaustegui then delivered that amount to Cowley (R 482, 483). Cowley then distributed those funds including $476,762.34 to Hatsis (R 485) and $900,000 to VanWalsum (Exs. 23, 29).

4. *Bida & Belaustegui Sale.*

The mining claims for this transaction were acquired from Sellas and Hollopeter for $22,270 and monthly lease payments totaling $2,730 for a total of $25,000 purchase price. Hatsis, rather than Bida and Belaustegui, advanced the $22,270 portion of the purchase price (R 512). Hatsis was then reimbursed for that amount from the sales proceeds (R 511–13). These claims were then sold to the plaintiff through the defendant Meier for $1,900,000. Bida and Belaustegui then returned the net amount of the sales proceeds to Cowley (R 509) who distributed the funds including $1,150,000 that was given to VanWalsum (R 511) for transfer overseas where it was placed for the ultimate practical benefit and use of the defendant Meier. Hatsis received checks of $512,730 and $30,843.50, and Bida and Belaustegui were paid $165,000, through Mr. Cowley.

5. *Globe Minerals, Inc. Sale.*

The mining claims for this sale were acquired for $57,000 from Jackson Mountain Mining Co. (Ex. 55). The purchase amount of $57,000 was delivered by Suckling out of the $900,000 he had received from Meier in the Bogdanich sale (R 529–531, 1315). These claims were then sold to the plaintiff for $1,400,000. The net sales proceeds were delivered to Cowley from Al Hays of Globe (R 584). Cowley then distributed that amount by cashier's check to VanWalsum who was waiting in front of the Continental Bank to take the check (R 537, 538). From other evidence the reasonable inference is he transferred it overseas.

It appears that in the close of the escrows on the five transactions, which are described in detail herein, the named sellers, in all cases except the one where Hatsis was the named seller, received the money from the escrow holder, and gave full control over the funds to Cowley, attorney for Hatsis (R 503). The instructions to the escrow holder were given by the sellers, but they knew little of the reasons and did not really make the decision how it should be distributed, nor did the named sellers participate in the real negotiation of the sales. They got their agreed fees and left the remainder with Hatsis, VanWalsum and Cowley for distribution (Belaustegui R 656, 647, 667, 671, 689; Hays R 582, 583; Bogdanich R 1700, 1706; VanWalsum R 968). The details on the Hatsis sale are unknown because the two persons who signed the sale agreement took the Fifth Amendment. Cowley worked with plaintiff through Foley and did not tell him of the redistributions (R 555).

From the five sales referred to, a total of $4,816,976.02 was paid to Suckling, Intermovie or VanWalsum (R 1402, 1216) and was part of a tax and investment program for the use and benefit of Meier and Hatsis. (R 1220, 1173, 1198, 1199, 1200, 1207, 1208, 1255, 1434, 1296.) The record shows this total came from the following sources:

| | | |
|---|---|---|
| Hatsis Sale | $ 480,000 | (R 1402, 965—Ex. 111, 112) |
| Bogdanich Sale | $ 900,000 | (R 1402, 1500—Ex. 75, 11) |
| Belaustegui Sale | $ 900,000 | (R 1402, 965) |
| Bida-Belaustegui Sale | $1,150,000 | (R 1404, 973, 577, 1405—Exs. 73, 74) |

Globe Mineral
Sale $1,386,976.02 (R 1406, 537—
 Ex. 54)

 $4,816,976.02

The final step in the transactions was the transfer of the funds overseas for the defendant Meier's use and benefit and with his knowledge. The court will summarize the more salient facts since the record contains numerous details bearing on defendant Meier's knowledge of the diversion of the funds and that they were to be transferred for his financial gain. Out of the Bogdanich sale, the defendant Meier at least received the use and benefit of $900,000 which he gave personally to his attorney Suckling (R 1500). Suckling paid his (Meier's) attorney's fees and costs from the money (R 1388), $100,000 was paid to plaintiff's superintendent in charge of mining (Ex. 93—R 1340), and $100,000 by check to Intermovie, and $312,000 was either given to VanWalsum or sent to the addressee, Mr. Jack Holmstrom of First Security Bank of Salt Lake City to buy 200,000 shares of stock from Bogdanich (R 1318–1320).

Hatsis told Meier at the settlement talk in Los Angeles in December, 1970, that he was entitled to share with Meier in the funds that went overseas from the mining transactions (R 1434). VanWalsum met with Hatsis in Salt Lake City in July, 1969, to talk about possibilities of transferring money to Europe (R 1145). He talked to him at least ten times. Hatsis told him how it was to be divided (R 1181). VanWalsum said the "set up was to get the money out of the country, and make certain investments . . . the people we were doing that for, which is Mr. Meier and Mr. Hatsis." (R 1207, 1208.) Hatsis told VanWalsum how much money out of every transaction was to go overseas (R 1287). VanWalsum makes it clear the five were working for two clients, Mr. Meier and Mr. Hatsis in all this, and that "they were the final owners of the funds we were handling through the whole system." (R 1255.)

The demand by Hatsis, through his attorney Cowley, upon Suckling, Meier's attorney, for an accounting leaves little doubt he believed they had an understanding and that he was entitled to an accounting (R 557, 1428, 1429). A fortiori, plaintiff should be entitled to an accounting (R 1434–1445). They met and worked out a division at the Los Angeles airport that brought Hatsis $450,000 more through a complex sale of stock, etc., which would net Hatsis $450,000 in cash. They agreed on a 50–50 deal on future transactions (R 1443).

In February, 1970, defendant Meier came to Salt Lake City in a private plane to pick up Hatsis for a trip to Curacao to talk with In der Reiden about the overseas fund (R 1285, 1394–95). A trust arrangement, funded with $1,100,000 of the money from the mining transactions was established for the benefit of Meier and his family. (Exs. 117, 119—R 1674.) Even though the trust corpus was to revert to the VanWalsum Management Company at the end of the ten-year term, VanWalsum testified that the money belonged to Meier (R 1022). Meier was told about the trusts by Suckling and approved the use of the family names (R 1507, 1508).

Meier claimed complete control over the overseas funds and that it was "my money," as VanWalsum (R 1179–80, 1019) and Suckling (R 1513–1514, 1674) testified. VanWalsum's testimony clearly shows the involvement of Meier in asserting control over the use of the money and his right to use the money as he saw fit. For example, in addition to the $900,000 that Suckling received from Meier and the trust arrangements that have been discussed previously, Meier directed a foreign company (Inriego) that had received some of the funds to transfer certain money from Anglo-American Pictures to Gillerion. Meier met with VanWalsum during the period that these transactions were taking place to arrange for the placement of the funds to insure that they would be for his use and benefit. Meier requested transfers of $25,000 and $16,000 from Anglo-American Pictures, to his personal numbered account (R 1212–15). Suckling's testimony essentially corroborates that of VanWalsum on these points

concerning Meier's involvement with the overseas funds and their placement.

The investment tax plan required the use of a resident Dutch corporation, Intermovie, to minimize taxes in the Netherlands (R 1410, 1411, 1668, 1669) and so Meier could not have direct control or ownership of the funds. The money was moved to Curacao to minimize taxes in the Netherlands. Suckling testified Inrespro was the ultimate recipient of all the mining money, and that Inrespro didn't have any funds other than that which came from Intermovie. (R 1414, 1427, 1520.)

It was the intention Meier would earn substantially more from the money than he would have netted otherwise (R 1569, 1670, 1671, 1673). Meier agreed to the plan. As noted above, however, he became impatient and made demands for payments and increased control.

Meier told Suckling of the source of the funds in January of 1970 and explained the suspect acquisition of wealth as a way Hughes had of rewarding good service, although Foley, the attorney for plaintiff, and Gray and Morgan, of plaintiff company, were not so advised, and the business procedures did not otherwise show any intention of such. In addition, because of rulings the court has made there is no issue on this claim.

 In summary, the plaintiff has established that there were five transactions and a total of their sales prices equals $8,550,000 as received from plaintiff. Less escrow expenses and authorized payments, there was released for distribution from the escrows to Cowley, Hatsis, et al., the sum of $8,401,587.72; that there was $4,816,976.02 diverted from the five transactions to accounts overseas through VanWalsum, Suckling, and Intermovie as well as other overseas business entities, with Meier's knowledge and for his substantial benefit. The plaintiff now seeks to have the defendant Meier account to the plaintiff for these amounts and prays the court to retain jurisdiction to enter a final judgment for resti-

tution following an accounting. The court is of the opinion, and so finds and concludes, that the defendant Meier occupied a trusted fiduciary position with the plaintiff for the acquisition of mining properties; that the defendant Meier breached that duty by secretly diverting funds from the five sales to his own use and benefit and to the damage of his principal; that there is no legal basis under which defendant Meier could have properly received for his own use and benefit any of such money; and that the defendant Meier must account for the funds entrusted to his care in relation to these transactions. The defendant Meier, therefore, has the burden of showing exactly how the funds entrusted to his care were expended and used and any credits to which he may be entitled. *See Rosenak v. Poller*, 110 U.S.App.D.C. 205, 207, 290 F.2d 748, 750 (D.C.Cir.1961); *Simper v. Scorup*, 78 Utah 71, 1 P.2d 941, 945 (1931). The court will retain jurisdiction to enter its final judgment of restitution upon receipt of the defendant Meier's accounting.

## CONCLUSIONS OF LAW AND ORDER

In view of the foregoing findings, the court concludes as a matter of law defendant Meier must, and he is herewith ordered, to render an accounting of the funds that were diverted by the defendants from the proceeds paid by plaintiff for the purchase of the mining properties in question. Said accounting shall be provided in thirty (30) days from the date of this order.

Because of the rulings of the court as set out above, the accounting herewith required of defendant Meier shall be without leave to claim approval by plaintiff, or its agents, for his retention of the funds received, if such he now acknowledges.

## ON MOTION TO SET ASIDE ORDER FOR ACCOUNTING AND MOTION TO ENTER FINAL JUDGMENT

On December 21, 1977, this court filed a Memorandum Opinion in Lieu of Findings

of Fact and Conclusions of Law (hereinafter "Opinion") in the above-entitled matter. In the opinion the procedural history of the matter was painstakingly developed and the contentions of the parties regarding the case in chief were thoroughly discussed and determined. After extensive and careful consideration of the matters presented, the court found ". . . that the defendant Meier occupied a trusted fiduciary position with the plaintiff for the acquisition of mining properties; that the defendant Meier breached that duty by secretly diverting funds from [five transactions involving the acquisition of mining properties for plaintiff to the use and benefit of himself and his agents and co-conspirators and to the damage of plaintiff]; that there is no legal basis under which defendant Meier could have properly received for his own use and benefit any of such money; and that the defendant Meier must account for the funds entrusted to his care in relation to these transactions." Opinion at 369. Whereupon, the court ordered Meier to render within thirty days ". . . an accounting of the funds that were diverted by the defendants from the proceeds paid by plaintiff for the purchase of the mining properties in question." *Id.*

Rather than provide an accounting within the time allowed by the court, defendant Meier has filed various papers requesting oral argument and raising essentially three broad questions. The court deems the briefing of these matters to be sufficient and the posture of the case such, with repetitious themes being urged, as not to require oral argument, and the request therefore is denied. Turning to the points raised in the motions, it appears that the defendant's major points are as follows: First, in defendant Meier's motion to set aside the court's order of December 21, 1977, it is argued that ". . . if this court rendered a money judgment against defendant Meier, it would be tantamount to a forfeiture contrary to many well-reasoned Supreme Court decisions." Second, as far as the court has been able to determine, defendant Meier claims not only that he is not required to provide an accounting to the court, by virtue of his invocation of the Fifth Amendment privilege against self-incrimination, but also that a money judgment cannot be entered against him because of his seeking the protection of the Fifth Amendment. Third, in response to plaintiff's motion asking the court to enter a final judgment in this matter in the amount of $7,940,837.72, defendant Meier contends that according to the court's opinion of December 21, 1977, the correct amount of judgment, if any there should be, is the lower sum of $4,816,976.02. Each of the present parties has responded to the motion of the other, and the court deems the matters presently fully submitted and ripe for a decision. Having fully and carefully considered the matters presented, the court is prepared to enter its rulings on defendant Meier's motion to set aside this court's order of December 21, 1977, and plaintiff's motion directing the entry of final judgment.

### FORFEITURE

Meier contends that entry of a final judgment against him would result in an "unconstitutional forfeiture," and relies heavily upon the case of *United States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) and the cases cited therein. *United States Coin & Currency* involved a forfeiture proceeding that had been brought against money found in the possession of a person who was arrested for failing to register as a gambler and to pay the gambling tax required by certain Internal Revenue Code provisions. These provisions required gamblers to submit special registration statements and tax returns that contained information that could well incriminate them in many circumstances. In the cases of *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and

*Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), cases upon which Meier also relies, the Supreme Court had held that "[b]ecause the risk of self-incrimination was substantial . . . [the] Fifth Amendment privilege could be raised as a defense to a *criminal prosecution* charging failure to file the required forms." 401 U.S. at 717, 91 S.Ct. at 1043 (emphasis added). Thus, the only question to be resolved by the Court in *United States Coin and Currency* was whether the Fifth Amendment privilege against self-incrimination could also be raised as a defense in *forfeiture* actions which technically are civil in nature.

Against the claim of the government, the Court found that, "[f]rom the relevant constitutional standpoint there is no difference between a man who 'forfeits' $8,674 because he has used the money in illegal gambling activities and a man who pays a 'criminal fine' of $8,674 as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force." *Id.* at 718, 91 S.Ct. at 1043. Thus, the Court affirmed the Circuit Court of Appeals which had ordered the return of the money to the person arrested, holding that a forfeiture proceeding was like a criminal proceeding, that a person could not be "punished" solely for failure to file the self-incriminatory forms, and that therefore the Fifth Amendment privilege against self-incrimination could be asserted to prevent "punishment" by forfeiture in such a proceeding.

■ The court wholly fails to see, however, in what way *United States Coin & Currency* and the line of cases indicated therein aid defendant. The present action simply is not in the nature of a forfeiture, nor is it "tantamount" to a forfeiture. First of all, as the above cases demonstrate, forfeiture proceedings are *quasi-criminal* in nature, are instituted by a *governmental body* against the *res* of the subject property

itself, and are directed toward *penalizing* the commission of certain offenses against the law. In addition to the cases cited above, *see One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). In a forfeiture proceeding, ". . . a right of property is divested or a liability to pay money to another person is created, by way of *retribution* for misconduct done or of a deterrent from misconduct apprehended, [and] the effect is in spirit *penal*." 8 *J. Wigmore, Evidence* 334 [McNaughton rev. 1961] (emphasis added).

■ The situation presented in a forfeiture proceeding is radically different and clearly distinguishable from the instant action and proceedings. An action for an accounting in equity is classically and completely *civil* in nature. This lawsuit involves purely *private* parties and seeks *personal* liability against an individual. And even though there may well have been significant criminal activity on the part of defendant Meier relating to the transactions out of which this action arises, *this is not the concern of this suit.* The present action has not been brought by plaintiff to penalize and seek retribution from Meier for various criminal offenses which may have been committed by him; instead, it has been brought so that plaintiff may seek *restitution* of the monies which defendant Meier has diverted from plaintiff by the breach of fiduciary duties owed to plaintiff. Even more significantly, a final judgment in this matter against Meier would not divest him of property that is rightfully his—it would simply require the return of money to plaintiff that is and should have been plaintiff's in the first instance. In sum, the forfeiture cases cited by defendant Meier do not help Meier, simply because the present action is not, nor has it ever been close to being, a forfeiture proceeding. The numerous allegations by Meier throughout the course of this litigation that the action is "like" a criminal proceeding, or those presently asserted, that it is in effect a forfei-

ture proceeding are of no legal significance and do not change this plain fact.

 Second, even if the present action were to be considered "tantamount to a forfeiture," as defendant Meier urges, the action or result would not necessarily be "unconstitutional." Although courts have a natural and understandable abhorence for forfeiture because of its sometimes harsh or irrational results, there is no question that properly conducted forfeitures and proceedings in the nature of a forfeiture are constitutional. Defendant Meier has not indicated any particular reason why the instant proceedings or the relief sought by plaintiff should be considered to be unconstitutional in any manner in and of themselves.

 Finally, as observed above, the straightforward holding of *United States Coin and Currency* is that the Fifth Amendment privilege against self-incrimination may be invoked in a forfeiture proceeding civil in nature. To the extent that defendant Meier cites the case for the proposition that the Fifth Amendment may be raised in a civil proceeding, the court has no quarrel with the use of the case. As is discussed in the immediately following section, the Fifth Amendment privilege is available to a person involved in a purely civil matter.

### FIFTH AMENDMENT

It is clear that the Fifth Amendment privilege against self-incrimination may be asserted in a civil proceeding. As the Supreme Court stated in the case cited by defendant Meier in his motion to set aside the accounting order of this court: "In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), we recently reaffirmed the principle that the privilege against self-incrimination can be asserted 'in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.' " *Maness v. Meyers*, 419 U.S. 449, 464, 95 S.Ct. 584, 594, 42 L.Ed.2d 574

(1975). The only question with which the court is now faced is exactly what it is that defendant Meier is attempting to accomplish by, and what effect it is that he wants to see flow from, his invocation of the privilege here.

#### 1. *Compelling an Accounting*

 If Meier is contending only that his raising of the Fifth Amendment prevents the court from *compelling* him to account for the diverted funds or from finding him in contempt of court for his failure to comply with the order to account, then the court agrees with the defendant. First, the present situation is one in which it appears that the Fifth Amendment has been properly raised. That is, in light of criminal proceedings pending against defendant Meier in the United States District Court for the District of Nevada, involving the very transactions which are the subject matter of this action, the accounting ordered by the court not only might possibly ". . . encompass evidence which may lead to criminal conviction, but [may also include] information which would furnish a link in the chain of evidence that could lead to prosecution, . . . [or] which [Meier] reasonably believes could be used against him in a criminal prosecution." *Id.* at 461, 95 S.Ct. at 592.

 Second, where it appears that the privilege against self-incrimination is properly raised, a court may not properly compel the disclosure of the testimony or evidence which is privileged. Although a diligent search by the court has not produced a case where the Fifth Amendment has been raised in response to an order by a court for an equitable accounting, there are several cases where the Fifth Amendment has been asserted in the context of discovery that are analogous to the present situation. The typical situation is one where a party is seeking discovery from another party and the latter party objects

to the attempted discovery on the basis of the Fifth Amendment. The party seeking discovery then applies to the appropriate court for an order compelling discovery. If the privilege has been properly invoked, the more recent and better reasoned decisions uniformly have held that in the absence of exceptional circumstances the discovery sought cannot properly be compelled. *See, e. g., Priebe v. World Ventures, Inc.*, 407 F.Supp. 1244 (C.D.Cal.1976); *Gulf Oil Corp. v. Tug Kate Malloy*, 291 F.Supp. 816 (La. 1968). Thus, in the discovery process, once a discovery device or question has been submitted to a person, the burden is placed upon that person to respond to and answer the question put to him. If the person properly objects on Fifth Amendment grounds, the answer cannot be compelled. Similarly, as is discussed more fully below, in an equitable accounting action, once the plaintiff establishes the basic elements of his case the burden is placed upon the defendant in the action to come forth and provide an accounting. But if, as here, the defendant objects to the accounting on Fifth Amendment grounds, the court cannot go on to *compel* the accounting. To do so would do violence to the Fifth Amendment and force the person asserting the privilege ". . . to surrender the very protection which the privilege is designed to guarantee." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *see Maness v. Meyers*, 419 U.S. 449, 461–63, 95 S.Ct. 584, 592–94, 42 L.Ed.2d 574 (1975). Thus, Meier cannot constitutionally be compelled to produce an accounting in the present action over his well-founded invocation of the Fifth Amendment privilege against self-incrimination.

## 2. *Entering a Final Judgment*

█ The very crux of defendant Meier's argument in support of his objection and motion to set aside, however, appears to be that because the court cannot compel an accounting in the present action, the court

". . . is *precluded from rendering a money judgment* against [Meier]." *Motion and Response of Defendant Meier re Order Filed Dec. 21, 1977* at 3. The reasoning upon which this contention is based appears to go as follows: this court's order of December 21, 1977, provides Meier with two alternatives—*either* to account for the funds diverted from plaintiff *or* to have a judgment entered against him; since, as shown above, defendant Meier may properly invoke Fifth Amendment protection and this court cannot compel him to account in this lawsuit, Meier feels that the only available alternative is to have a judgment entered against him; and the possible resulting judgment, Meier claims, would somehow be counter to the principle announced in some cases that ". . . the Government may not use evidence against a defendant in a criminal case which has been coerced from him under [the] penalty of either giving the evidence or suffering a forfeiture of his property." *United States v. Kordel*, 397 U.S. 1, 13, 90 S.Ct. 763, 770, 25 L.Ed.2d 1 (1970). The court disagrees with the reasoning and contention of defendant Meier.

Defendant Meier appears to misapprehend the quantity and quality of the evidence which has been presented in this case to date and the nature of the action of an accounting in equity. As the court rehearsed in great detail in its opinion of December 21, 1977, there is substantial evidence in the record upon which to base a ruling fixing liability on defendant Meier for the funds diverted from plaintiff. That is, plaintiff established that there were five pertinent transactions with the total of their sales prices equaling $8,550,000.00 and that the responsibility for the distribution of these funds was entrusted to the care of defendant Meier. Opinion at 30–31. The effect of the court's accounting order was to provide Meier with the *opportunity* to rebut plaintiff's evidence and to show that the funds entrusted to him were expended or used for the benefit of plaintiff or to

otherwise demonstrate grounds as to why he, Meier, should not be held liable for the monies that plaintiff had established were entrusted to his care. And now that defendant has declined to avail himself of the opportunity to account for the funds over which he had responsibility, the court may proceed to enter a judgment in this matter upon the basis of all the evidence before the court.

■■■■ The nature of an equitable accounting and its effect in the present action is simply stated. Before an order for an accounting is entered, a plaintiff must show that his remedy at law is inadequate, that a fiduciary relationship between the plaintiff and the defendant exists, and that plaintiff is or may be entitled to the money or property of the plaintiff that has come into the defendant's hands. *See Rosenak v. Poller*, 110 U.S.App.D.C. 205, 207, 290 F.2d 748, 750 (D.C.Cir. 1961); *Simper v. Scorup*, 78 Utah 71, 1 P.2d 941, 945 (1931). The plaintiff in the present action has established these elements. Opinion at 369. After the order for an accounting, interlocutory in character, is entered, the burden shifts to the defendant to show that the plaintiff, in fact, is not entitled to the money or property that has come into the defendant's hands. "[A]nd then, if from *all* the evidence, it appears there is any sum certain due the plaintiff, judgment will be entered for that sum in favor of plaintiff and against the defendant." *Warden v. Richardson*, 203 Okl. 474, 223 P.2d 338, 341 (1950) (emphasis added).

■■■ The court is of the opinion that *all* of the evidence in this matter shows that the sum of $7,940,837.32 is due the plaintiff Hughes Tool Company. The effect of Meier's refusal to account is to leave the court with the substantial and adequate evidence that was presented during the trial of the case in chief and was weighed and set forth in the court's opinion of December 21, 1977, *plus* the adverse inference that can now be drawn against Meier for his failure to pro-

vide an accounting. As the court stated in its order in the context of its discussion of the court's exercise of personal jurisdiction over Meier, "[t]he United States Supreme Court recently stated 'the prevailing rule' in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by *a party to a civil cause*." ' *Id.* at 318, 96 S.Ct. [1551] at 1558 *quoting* 8 *J. Wigmore, Evidence* 439 (McNaughton rev. 1961) (emphasis in original)." Opinion at 363. Plaintiff has produced probative evidence against Meier that Meier diverted the above sum from plaintiff and that Meier is now liable for that amount to plaintiff. Defendant Meier has refused to respond to the evidence presented by plaintiff. In sum, the preponderance of the evidence shown by plaintiff against defendant Meier in the trial of this matter allows the court to enter a final judgment in this matter against Meier from the plaintiff's evidence, particularly in the absence of the accounting that has been ordered. And this result still allows Meier to claim the Fifth Amendment and refuse to account. The adverse inference that may be drawn under these circumstances, from his failure to answer, strengthens the probative value of plaintiff's evidence, without putting words in defendant's mouth in violation of his Fifth Amendment rights.

■■■ The suggestion of defendant Meier that the sole fact he has invoked the Fifth Amendment privilege against self-incrimination renders the court powerless to enter a final judgment against him is utterly untenable. The privilege is a personal privilege that protects against the *testimonial compulsion* of an accused to testify against himself. *See Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48

L.Ed.2d 39 (1976). The priceless and time-honored shield provided by the privilege cannot be used as an insurmountable barrier to block the introduction of other damaging evidence through the mouths of others, that provides, as here, the measure of defendant's responsibility. The invocation of the Fifth Amendment privilege does not and cannot stop the mouths of all witnesses, as evidence against the person claiming the privilege. The Fifth Amendment protects an individual, not from the introduction of incriminating evidence, but from compelling him to produce it. *See Maness v. Meyers, supra,* 419 U.S. at 462–463, 95 S.Ct. at 593; *United States v. Harper,* 397 F.Supp. 983, 996 (E.D.Pa.1975). The court has proper jurisdiction over the subject matter and parties of this action, and the court is otherwise empowered to enter a final judgment herein. That Meier has raised the Fifth Amendment in the course of this matter does not alter the court's ability to enter judgment under the circumstances described.

■ The court recognizes that, for example, if a judgment were to be entered *solely* on the basis of a civil litigant's failure to appear or to take other significant steps in an action due to his invocation of the privilege against self-incrimination, a different situation might be presented. *See, e. g., de Antonio v. Solomon,* 42 F.R.D. 320, 322 (D.Mass.1967). Such a sanction would make the assertion of the privilege too costly. Where, as here, however, there is substantial evidence upon which a judgment may soundly be based, regardless of the assertion or non-assertion of the privilege, a judgment properly may and must be entered. To hold otherwise would produce entirely unacceptable results, in that a plaintiff in a civil matter could be deprived of his right to a judgment whenever a defendant invoked the Fifth Amendment privilege in an action where he has the burden to answer; and this notwithstanding the plaintiff may have produced probative evidence which, buttressed by the adverse inference which would support such evidence, would provide the factual predicate for a judgment.

To the extent that Meier's suggestion is attributable to the unique burdens imposed by the action of an accounting in equity, the result urged by Meier again must be denied. The nature and effect of the burdens of the parties to an accounting action are set forth above. The court is of the opinion that the invocation of the privilege against self-incrimination in the present action cannot have the effect of upsetting the rights and obligations of the parties in an accounting action. In accordance with the immediately preceding discussion of the nature and purpose of the Fifth Amendment privilege, it is manifest that, "[a]lthough claimable in a civil proceeding, the privilege was not intended '. . . to affect the rights of the litigants in the ordinary civil action.'" *Thoresen v. Superior Court,* 11 Ariz.App. 62, 461 P.2d 706, 710 (Ariz.App. 1970).

In light of the above, it follows that defendant Meier was not faced with an impermissible dilemma as a result of this court's order of December 21, 1977. The court in effect provided Meier with an opportunity to come forward and show why a judgment, based on independent evidence presented to the court by plaintiff, should not be entered against him. Meier declined to accept this invitation. No evidence has been coerced from Meier, and the *only* effect of his assertion of the Fifth Amendment privilege against self-incrimination is that where plaintiff provides evidence of the measure of defendant's responsibility an inference against defendant may be drawn from these facts and defendant's failure to answer. There has been no valid reason presented why this court is precluded from entering a final judgment, and no "forfeiture" of Meier's property will result if a judgment is entered. Based on all the evidence presented, the court concludes that it is proper to proceed to a final judgment in this matter.

## AMOUNT OF JUDGMENT

In the recent motions and memoranda filed by the parties, a dispute has developed

as to the correct amount of the judgment that should be entered against defendant Meier. The conflict arises from a possible ambiguity in the court's opinion of December 21, 1977. There it was stated that plaintiff had established that, "[l]ess escrow expenses and authorized payments, there was released for distribution from the escrows to Cowley, Hatsis, et al., the sum of $8,401,587.72; that there was $4,816,976.02 diverted from the five transactions to accounts overseas . . . with Meier's knowledge and for his substantial benefit." Opinion at 369. It is now the position of plaintiff that the court ordered defendant Meier to account for the larger sum of $8,401,587.72, and that judgment should be entered against Meier in the amount of $7,940,837.72 (the amount of $8,401,587.72 mentioned in the court's opinion less credits suggested by plaintiff in its memorandum of January 30, 1978, totaling $460,750.00). On the other hand, it is argued by Meier that the court ordered him to account only for that sum of $4,816,976.02 that the court found was diverted with his knowledge and for his benefit, and that if there is to be a judgment entered against him it must be for that lower amount. This was not the court's intention. The reference to the $4,816,976.02 was an observation with respect to the final disposition of this portion of the $8,401,587.72. The rest of the funds went through or were the responsibility of Meier on these transactions for which he had full responsibility but have not been traced to their final location.

In this regard, however, plaintiff need only show defendant was the trusted agent in the transactions in question, that he received and/or was responsible for the distribution of the funds, and has failed to account for them, that is, failed to show they were fully applied in accordance with his obligations to his principal. The $4,816,-976.02 manifestly was not so applied, and as to the difference up to $7,940,837.72, the defendant having had responsibility for the acquisition of the mining claims and ordering the payment of funds and setting the procedure for distribution has the duties of a trusted agent to account for any funds not applied to the principal's benefit, and is subject to judgment for failure to do so. No showing of their application to plaintiff's benefit having been made, and plaintiff being entitled to their benefit, the loss so represented is chargeable to the defendant.

Although this would be sufficient, it is strengthened by the adverse inference that defendant and/or his co-conspirators and agents received the benefit of these funds, since the conspiracy covered all five transactions. Since the evidence is clear substantial sums from each of the transactions were misapplied to defendant's and Hatsis' benefit, Meier's total responsibility as trusted agent for the application of all of the funds properly for plaintiff's benefit in those transactions provides the factual predicate for the conclusion that since the funds have not been applied to plaintiff's benefit they were misapplied with defendant's help and he is, as the plaintiff's trusted agent, responsible for this failure.

Judgment should be entered accordingly.