RENDERED: NOVEMBER 21, 2007
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2005-SC-000861-DG

LINDA KERN CUMMINGS      APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.      NO. 2004-CA-001185
BOYLE CIRCUIT COURT NO. 98-CI-00150

JOHN BROOKS PITMAN (EXECUTOR
OF THE ESTATE OF BETTY KERN
MILLER), ET AL      APPELLEES

**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

REVERSING AND REMANDING

Due process of law imposes limitations on a court's exercise of personal jurisdiction over nonresident defendants. In the instant case, a nonresident attorney engaged in significant legal and fiduciary activities in Kentucky. Conceding that he is subject to personal jurisdiction in Kentucky for claims arising from legal services performed, he seeks to avoid personal jurisdiction in this forum for actions in his role as trustee of the trust agreement he drafted. Appellee, R. Andrew Boose, analogizes himself to one with two hats and posits that in Kentucky he wore only his "attorney hat" but never donned his trustee hat except for one brief moment. As Mr. Boose appears to have engaged in a fully anticipated continuing course of conduct in Kentucky sufficient to meet statutory and federal due process standards for personal jurisdiction, we are

unable to accept his contention that though he acted as an attorney in Kentucky, only in New York did he act as trustee. We therefore reverse the lower courts and remand for further proceedings.

Appellant, Linda Kern Cummings is the daughter of Betty Kern Miller, the only child of the renowned composer and two-time Oscar winner, Jerome Kern (1885-1945). Jerome Kern is well known for composing the music for "Showboat" and for his composition of many popular songs, including "Smoke Gets in Your Eyes" and "The Way You Look Tonight." His body of work includes more than 800 individual copyrights and income-producing royalty agreements. Mr. Kern was one of the leading American composers of the Twentieth Century.

Upon Jerome Kern's death in 1945, his daughter, Betty Kern Miller, inherited the rights to his intellectual property. In the late 1970s or early 1980s, Ms. Miller moved to Danville, Kentucky, where she resided until her testate death in Kentucky on April 5, 1996, at age seventy-seven.

For many years, Harriet Pilpel, a prominent New York attorney, represented Ms. Miller and administered her extensive literary property rights. Ms. Pilpel died in 1991, and one day thereafter, Appellee, R. Andrew Boose, also a New York attorney but working with a different firm, spoke with Ms. Miller about becoming his client.[1] During this and future telephone conversations, Ms. Miller remained in Kentucky. Later in 1991, Mr. Boose traveled to Kentucky to personally meet with Ms. Miller. Mr. Boose

---

[1] Letter to Ms. Miller from attorney at Kay Collyer & Boose, Jeremy Nussbaum, dated April 25, 1991, states: "As discussed in our telephone conversation *yesterday afternoon* . . .. We are delighted that you are becoming a client, and look forward to working with you. Andy [R. Andrew Boose] will be back in the office on Monday, and will call you then to discuss the details." (Emphasis added).

testified that the sole purpose for this trip was to discuss representing Ms. Miller by managing the copyrights and the royalties derived from her father's compositions. From this contact, a professional relationship arose. During this period, in 1994, Ms. Miller called Mr. Boose from Kentucky to inquire about the appropriate disposition upon her death of the royalties and copyrights that he was currently managing. During that telephone call, Mr. Boose testified that Ms. Miller took his advice and requested the creation of a trust.

In response, Mr. Boose's firm prepared an estate plan, consisting of a trust agreement and second codicil to Ms. Miller's will. This codicil included a pour-over provision to fund the trust from proceeds of her literary property. The trust agreement named Ms. Miller as grantor (settlor) and then named Ms. Miller and Mr. Boose as trustees. Accordingly, Ms. Miller and Mr. Boose were to become co-trustees on the day the trust instrument was executed. Upon Ms. Miller's death, Mr. Boose would become the sole trustee and would obtain sole legal title to the trust property.[2] The trust agreement was explicit, "If Betty Kern Miller shall cease to act as Trustee thereof, there shall be no necessity to appoint a successor Trustee." The trust agreement also contained several extraordinary provisions giving the trustee(s) "absolute discretion." For example, among other enumerated powers, the trustee(s) were given:

> (7) [The] [p]ower to deal with Literary Property (as herein defined), with the same freedom and to the same full extent as if they were the sole and absolute owners thereof in their own right, and without limitation, make any and all agreements, contracts or arrangements which they, in their discretion, shall determine, and employ and compensate any attorneys, managers and/or agents (including any person who is serving as Trustee), for or in connection with the sale, lease, licensing, exploitation, utilization,

---

[2] Restatement (Second) of Trusts § 103 (1959): "Upon the death of one of several trustees, the title to the trust property is in the survivors as trustees."

turning to account, or other disposition of, or dealing with, Literary Property; and the Trustees shall be under no liability or obligation to any person interested in the Trust for any action taken by them pursuant to this power.

During the drafting process, Mr. Boose telephoned an attorney in Danville, Kentucky, William Barnett, to review the trust and codicil for compliance with Kentucky law.

On April 28, 1995, Mr. Boose made his second visit to Kentucky. This time, he personally met with the Danville attorney, Mr. Barnett, to further discuss Ms. Miller's estate plan. Later during the trip, Mr. Boose met with Ms. Miller at her home where she executed the trust agreement and second codicil. The trust agreement stated that it was made between "Betty Kern Miller, of Danville, State of Kentucky, as Grantor, and Betty Kern Miller and R. Andrew Boose with an office in New York, New York." It also provided that New York law would govern.[3] The document was executed by Ms. Miller and Mr. Boose and notarized by a Kentucky notary public in Boyle County, Kentucky, on April 28, 1995. Despite Mr. Boose's argument to the contrary, at that time, pursuant to the terms of the trust agreement, Ms. Miller and Mr. Boose immediately became co-trustees of the revocable *inter vivos* trust.

---

[3] While the trust agreement provided for application of the substantive law of New York, the determination of whether Kentucky may exercise personal jurisdiction is a matter of state law, particularly where, as here, the trust agreement is silent with respect to forum selection. See Heer v. Price, 2007 WL 1100693 (W.D.Ky. 2007) (recognizing that choice of law and forum selection provisions may differ. "Paragraph 15, according to its plain language is a choice of law provision rather than a forum selection clause. The provision relates only to what law is to govern a dispute between the parties, it is silent concerning where the parties may bring an action."). See also KFC Corp. v. Lilleoren, 783 F.Supp. 1022 (W.D.Ky. 1992) (holding that choice of law provisions and forum selection may differ), and United Radio, Inc. v. Wagner, 448 F.Supp.2d 839 (E.D.Ky. 2006) (recognizing that despite a choice of law provision dictating the law of the forum, whether personal jurisdiction existed was nevertheless subject to an analysis of the facts).

4

At the same time, Ms. Miller also signed a second codicil to her last will and testament, which bequeathed "all my right, title and interest in and to any Literary Property . . . to the Trustees of a trust created by Agreement executed the 28th day of April, 1995 between myself as Grantor, and myself and R. Andrew Boose, as Trustees . . .." In addition to drafting the second codicil for Ms. Miller, while in Kentucky Mr. Boose signed as one of the two required attesting witnesses, attesting that "to the best of [his] knowledge, the Testatrix [was] . . . of sound mind, and under no constraint or undue influence."

Upon Ms. Miller's death on April 5, 1996, Mr. Boose continued to administer the trust, but as sole trustee. He was also employed as special counsel to the estate under the terms of a June 6, 1996, agreement with the decedent's executor, John Brooks Pitman, a Kentucky resident. From April 1996 through August 2002, the Miller trust paid Mr. Boose (or his firm) a total of $199,170 in legal fees. Further, beginning on May 27, 1997, with a transfer of $147,868, Mr. Pitman commenced distribution of substantial sums of money from Ms. Miller's Kentucky bank account to Mr. Boose, as trustee. Illustrative of the ongoing relationship between the executor Mr. Pitman and Mr. Boose, beginning in May 1996, Mr. Boose wrote more than 90 letters to Mr. Pitman in Kentucky. He also corresponded at least 20 times with the two primary beneficiaries of the trust, Ms. Miller's daughter, Linda Kern Cummings, of Kentucky, and her brother, Steven Kern Shaw, formerly a resident of Kentucky. The record indicates that by April 2002, Mr. Boose, as trustee, had received a total of $3,142,123.76 in literary property royalties from Ms. Miller's estate.

This action was brought on April 14, 1998, in the Boyle Circuit Court by Ms. Miller's daughter and trust beneficiary, Linda Kern Cummings, against, *inter alia*, Mr. Boose, individually and as trustee of the Miller trust. Ms. Cummings alleged that Ms. Miller suffered from diminished capacity and that Mr. Boose exercised undue influence over her, causing her to execute a codicil "transferring all her right, title and interest to literary works, including management thereof, to this Trust in which [Mr. Boose] was to have sole authority." Cummings further alleged that Mr. Boose violated fiduciary duties; that his actions constituted a conflict of interest; and that he engaged in the unauthorized practice of law. Mr. Boose filed an answer and admitted that the court had personal jurisdiction over him in his individual capacity as an attorney under Kentucky's long-arm statute, KRS 454.210. However, Mr. Boose contended that his activities with respect to the trust occurred in New York and denied that the Kentucky court had personal jurisdiction over him as trustee. He argued that there was a distinction between the claims against him in his individual capacity concerning the services he rendered as Ms. Miller's attorney and the claims against him as trustee. Upon his motion, the Boyle Circuit Court granted Mr. Boose partial summary judgment concluding that it lacked personal jurisdiction with respect to his activities as trustee.

The Court of Appeals affirmed the trial court, holding that Mr. Boose, as trustee, had not purposefully availed himself of the privileges of acting in Kentucky or caused a consequence in Kentucky. Instead, the court concluded, "The only activity in Kentucky that Boose engaged in as trustee was signing the trust document. Boose's duties as trustee did not begin until the trust was funded upon Miller's death in 1996." From our examination of relevant statutes, case law and the continuing course of conduct

6

demonstrated by the record, it is impossible to distinguish between Mr. Boose's activities as an attorney and his activities as trustee. The latter was merely a continuation of the former. From its inception, the professional relationship between Mr. Boose and Ms. Miller, and subsequently her estate, was seamless. We reject an abstract severance of the professional activities undertaken on the belief that it would result in an unreasonable application of the law. We therefore reverse the lower courts.

The Court of Appeals took the position that the Miller trust did not come into existence until it was funded. It is true that no assets were delivered to the trust until Ms. Miller's death, but the trust agreement empowered "the Grantor, or any other person, [to] hereafter transfer to the Trustees cash or other property, including Literary Property, to be held and administered as part of the property of the Trust, by *inter vivos* gift, testamentary bequest or otherwise." Another provision in the trust agreement contemplated transfer of assets during Ms. Miller's lifetime and recognized that the trustees' powers and duties arose before Ms. Miller's death,

> The Trustees are authorized and empowered at any time and from time to time during the Grantor's lifetime or after her death, to accept by way of addition to the Trust any property which the Grantor or any other person may wish to transfer and deliver to the Trustees, or which she or any other person may devise and bequeath by a Last Will and Testament to the Trustees, and any property so added may be commingled with other property in the Trust and shall be held, administered and disposed of as part of the Trust.

By the terms of the trust agreement drafted by Mr. Boose's law firm, the trust became a fully functional, revocable *inter vivos* trust on April 28, 1995, and the fact that neither Ms. Miller, nor anyone else, transferred property to the trust prior to her death is of no consequence.

Since the adoption of the Uniform Testamentary Additions to Trust Act, KRS 394.076, a so-called "dry trust" is a valid trust, imposing fiduciary duties upon trustees the moment the trust is created. The duty of a trustee to his beneficiaries is "that of *uberrima fides*, or utmost fidelity."[4] As stated in <u>Bryan v. Security Trust Co.</u>,

> One of the most fundamental duties of the trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the *cestui que* trust. He must exclude all selfish interest and also all consideration of the welfare of third persons. This duty grows out of the fact that the trustee is a representative and out of the well-known inability of human beings to serve two masters at once or to act satisfactorily with conflicting interests.[5]

Mr. Boose alleges that he is not subject to service of process pursuant to Kentucky's long-arm statute in his role as trustee because his only contact with Kentucky in that regard was the brief moment when he signed the trust instrument in Danville. From that point, he argues he acted as trustee only in New York after Ms. Miller's death. This argument is flawed for two reasons. First, the fiduciary duties owed by Mr. Boose, as trustee, to Ms. Miller began upon the execution of the trust agreement and continued thereafter. Thus, even if we were to accept Mr. Boose's splitting-of-the-person theory, he continuously wore his so-called "trustee hat" from the inception of the trust agreement. The second flaw in Mr. Boose's argument is that the appropriate personal jurisdiction analysis in Kentucky does not consider the role in which a person perceives himself as acting so long as the long-arm statute is satisfied and the contacts shown pass constitutional muster.

---

[4] <u>Wiggins v. PNC Bank, Kentucky, Inc.</u>, 988 S.W.2d 498, 501 (Ky.App. 1998), <u>citing</u> <u>Bryan v. Security Trust Co.</u>, 296 Ky. 95, 176 S.W.2d 104 (1943).
[5] <u>Bryan v. Security Trust Co.</u>, 176 S.W.2d at 107.

The Kentucky long-arm statute, KRS 454.210, states, in relevant part, "A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's: (1) Transacting any business in this Commonwealth; (2) Contracting to supply services or goods in this Commonwealth; (3) Causing tortious injury by an act or omission in this Commonwealth...."[6] The purpose of this statute is to permit Kentucky courts to exercise personal jurisdiction over nonresident defendants while complying with federal constitutional due process.[7] We have interpreted this statute to authorize *in personam* jurisdiction to reach the outer limits of the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution,[8] and because of this breadth, our statutory requirements have merged into the federal due process analysis.[9] For this reason, we "need only determine whether the assertion of personal jurisdiction violates constitutional due process."[10]

The foundation decision for an analysis of the law in this area is <u>International Shoe Co. v. State of Washington</u>.[11] There it was determined that a nonresident defendant can be subject to a judgment *in personam* if he has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[12] Although the Court refrained

---

[6] KRS 454.210(2)(a).
[7] <u>Friction Materials Co., Inc. v. Stinson</u>, 833 S.W.2d 388, 390 (Ky.App. 1992). <u>See also</u> <u>Texas American Bank v. Sayers</u>, 674 S.W.2d 36, 38 (Ky.App. 1984).
[8] <u>Mohler v. Dorado Wings, Inc.</u>, 675 S.W.2d 404, 405 (Ky.App. 1984).
[9] <u>Wilson v. Case</u>, 85 S.W.3d 589, 592 (Ky. 2002).
[10] <u>Aristech Chemical Int'l Ltd. v. Acrylic Fabricators Ltd.</u>, 138 F.3d 624, 627 (6th Cir. 1998).
[11] <u>International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Employment</u>, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
[12] <u>International Shoe</u>, 326 U.S. at 316, <u>quoting</u> <u>Milliken v. Meyer</u>, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940).

from defining "minimum contacts," it suggested several factors to consider in determining whether the "minimum contacts" requirement was fulfilled, including: the quantity and quality of the activities, whether the activities of the defendant were continuous and systematic, whether the defendant availed himself of the laws of the forum state, and whether the defendant's activities in the state gave rise to the cause of action.

The United States Supreme Court later decided another important jurisdictional case, World-Wide Volkswagen Corp. v. Woodson,[13] and recognized the two related but distinguishable functions of the "minimum contacts" test. The Court noted that this analysis protects defendants from the "burdens of litigating in a distant or inconvenient forum" and acts to ensure that the states "do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."[14]

As we have previously recognized, International Shoe, World-Wide Volkswagen and other federal personal jurisdiction cases "provide a road map for judicial bodies, including Kentucky courts, trying to determine the reach of their personal jurisdiction."[15] Ultimately, we have organized this framework into a workable three-prong jurisdictional test to evaluate a defendant's contacts with the forum state for purposes of long-arm jurisdiction.[16] The first prong of the test asks whether the defendant purposefully

---

[13] World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
[14] World-Wide Volkswagen, 444 U.S. at 291-92.
[15] Wilson, 85 S.W.3d at 593.
[16] Id. See Southern Machine Co. v. Mahasco Industries, Inc., 401 F.2d 374, 381 (6th Cir. 1968), citing McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). See also Perry v. Central Bank & Trust Co., 812 S.W.2d 166 (Ky.App. 1991).

availed himself of the privilege of acting within the forum state or causing a consequence in the forum state. The second prong considers whether the cause of action arises from the defendant's activities in the forum. The final prong requires the defendant to have a substantial enough connection to the forum state to make exercise of jurisdiction over the defendant reasonable. Each of these criteria represents a separate requirement, and jurisdiction will lie only where all three are satisfied.[17]

As our approach to the analysis is well settled, we will not stray from it and adopt a rule that shields a defendant who has satisfied the criteria but who assumes a dual personage with respect to his activities. As the U.S. Supreme Court has said, "[T]he Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed."[18] Thus, we will continue to employ the three-prong test to determine the outer limits of personal jurisdiction being always mindful of the International Shoe overarching requirement of "fair play and substantial justice," which broadly considers the burden on the defendant in litigating in this forum; the interests of the forum; the plaintiff's interest in litigating in this forum; and our system's interest in judicial economy.[19] In doing so, we keep faith with constitutionally-mandated due process safeguards in asserting or declining jurisdiction.

---

[17] Wilson, 85 S.W.3d at 594; LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1303 (6th Cir. 1989).
[18] Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). (Citations omitted).
[19] Wilson, 85 S.W.3d at 596. See International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Employment, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

In analyzing the first prong of the test, the Supreme Court has stated, "[The] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random, 'fortuitous' or 'attenuated' contacts."[20] Thus, in determining whether the purposeful availment test is satisfied, courts must look beyond formalistic measures such as physical presence in the forum and instead evaluate the nature of the contacts and the degree to which they represent a purposeful availment of the forum's protections and benefits.[21] The two cornerstones of this analysis are foreseeability and voluntariness.[22] As such, the Supreme Court said in Burger King Corp. v. Rudzewicz,

> [W]here the defendant 'deliberately' has engaged in significant activities with a State, **or has created 'continuing obligations' between himself and residents of the forum**, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in the forum as well. (Emphasis added).[23]

Mr. Boose voluntarily undertook to represent Ms. Miller, a Kentucky resident. Although he maintains that he did not actively solicit Ms. Miller as a client, he certainly traveled to Kentucky to meet with her and to discuss representing her. Mr. Boose served as Ms. Miller's attorney and managed her literary property for several years. The record also demonstrates that under Mr. Boose's authority and supervision, his law firm drafted the trust agreement for Ms. Miller, naming Mr. Boose as co-trustee. Recognizing that Kentucky law would control the formalities of the estate plan

---

[20] Burger King Corp., 471 U.S. at 475. See also Wilson v. Case, 85 S.W.3d 589, 594 (Ky. 2002).
[21] Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir. 1994).
[22] Ticketmaster-New York v. Alioto, 26 F.3d 201, 207 (1st Cir. 1994).
[23] Burger King Corp., 471 U.S. at 476.

documents, Mr. Boose sought legal advice from a local attorney to ensure the documents were in compliance. He also prepared a second codicil to Ms. Miller's will to be probated in Kentucky. During his second trip to Kentucky, Mr. Boose executed the trust agreement and codicil, serving as one of the attesting witnesses for the codicil. He provided legal assistance regarding the literary property to Mr. Pitman, a Kentucky resident and executor of Ms. Miller's estate, and there was extensive correspondence between Mr. Boose and the interested Kentucky parties. Mr. Boose accepted literary property proceeds which came from Kentucky and made trust distributions to the primary beneficiaries, Ms. Cummings and Mr. Shaw. Ms. Cummings, the Appellant, always remained a Kentucky resident and Mr. Shaw is a former Kentucky resident. Of course, throughout the course of these continuing activities, Mr. Boose received substantial payment from Ms. Miller or her executor, both Kentucky residents.

One may reasonably infer that from the outset Mr. Boose anticipated performing ongoing fiduciary services with respect to the trust. Necessarily, such services were to be performed for benefit of Kentucky citizens and would require an extended period of time. Burger King recognized that intentionally creating continuing obligations with residents of the forum would be sufficient to subject the nonresident to the burden of litigating in the forum.[24]

A persuasive case in this area is Seijo v. Miller,[25] which analyzed whether two nonresident trustees were subject to personal jurisdiction in the forum. Similar to our case, the income beneficiary of the trust, a resident of Puerto Rico, brought a claim in Puerto Rico pursuant to its long-arm statute, alleging breach of fiduciary duties by the

---

[24] Id.

[25] Seijo v. Miller, 425 F.Supp.2d 194 (D. Puerto Rico 2006).

nonresident trustees. The long-arm statute in Puerto Rico, like its counterpart in Kentucky, extended personal jurisdiction to the full extent of constitutional authority. The court concluded that the trustees had purposefully availed themselves of the forum because not only were the primary beneficiary and grantor from Puerto Rico, but the trustees had also sent several trust disbursements to the primary beneficiary in Puerto Rico.[26] Further, the court said,

> As trustees, they voluntarily took on the responsibility of administering the trust established for the benefit of a resident of Puerto Rico. Entering into this agreement, which had a substantial connection to Puerto Rico, made it foreseeable that the [trustees] may be brought before a federal court in Puerto Rico.[27]

As noted, Mr. Boose's contacts in Kentucky went far beyond merely "administering" Ms. Miller's trust.[28] From the evidence, Mr. Boose's professional connections with Kentucky are such that he should have reasonably anticipated being haled into our courts. He deliberately engaged in significant acts in Kentucky and created continuing obligations between himself and Kentucky residents.[29] We conclude that the evidence satisfies the first criteria of the test by showing purposeful availment of the privilege of acting within Kentucky or causing consequence in this state.

The second prong of the minimum contacts test requires the court to decide whether the cause of action arises from the defendant's activities in the state. Interpreting this criterion, the United States Court of Appeals for the Sixth Circuit has recognized, "Only when the operative facts of the controversy are not related to the

---

[26] Seijo, 425 F.Supp.2d at 200.
[27] Id.
[28] See Id.
[29] See Burger King Corp., 471 U.S. at 476.

14

defendant's contact with the state can it be said that the cause of action does not arise from that contact."[30]

In her complaint, Ms. Cummings alleged that Ms. Miller suffered from diminished capacity and that Mr. Boose exercised undue influence over her, causing her to execute a codicil "transferring all her right, title and interest to literary works, including management thereof, to this Trust in which [Mr. Boose] was to have sole authority." Because her codicil was evaluated by another attorney in Kentucky and then executed in Kentucky, with Mr. Boose serving as a witness to her testamentary capacity, Ms. Cummings' claims of diminished capacity and undue influence arose out of Mr. Boose's activities in Kentucky. Ms. Cummings also alleged that Mr. Boose engaged in the unauthorized practice of law in Kentucky, where he was not licensed to practice. This claim arose from the legal steps Mr. Boose took in Kentucky. The final claim alleging a conflict of interest by Mr. Boose in drafting and executing a trust agreement and naming himself sole trustee arose from the execution of the trust agreement, which occurred in Kentucky when Mr. Boose and Ms. Miller signed the agreement. Clearly the operative facts of the controversy are related to actions occurring in Kentucky.

The last prong to be considered requires the acts by the defendant or the consequences caused by the defendant to have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. As the United States Court of Appeals for the Sixth Circuit concluded in Aristech Chemical International Ltd. v. Acrylic Fabricators Ltd., "Whether the exercise of jurisdiction is reasonable ultimately depends on whether Kentucky has an interest in resolving the

---

[30] Southern Machine Co. v. Mahasco Industries, Inc., 401 F.2d 374, 384 (6th Cir. 1968).

dispute between [the parties]."[31] The court also stated, "This circuit has already observed that where the first two criteria are satisfied, 'only the unusual case will not meet this third criterion.'"[32] This is not such an unusual case, and the third criterion is easily established.

McGee v. International Life Insurance Co.[33] is instructive. There, a nonresident defendant solicited a California resident to purchase a reinsurance agreement. The Court noted that the defendant had never had an office or agent in California, and he had never solicited or done any other insurance business in California apart from the policy involved in the case. However, the Court concluded that the cause of action had a substantial connection with the state because "[t]he contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died."[34] Therefore, the Supreme Court held, "It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." Recognizing the important interest involved, the Court stated that although California may be an inconvenient forum for the insurer, inconvenience certainly did not amount to a denial of due process.[35]

It should be remembered that Mr. Boose came to Kentucky to do business with a Kentucky resident, Ms. Miller. More significantly, she hired him to serve as her attorney and trustee. The fiduciary duties and ethical responsibilities associated with those roles

---

[31] Aristech Chemical, 138 F.3d at 628.

[32] Aristech Chemical, 138 F.3d at 628, citing American Greetings Corp. v. Cohn, 839 F.2d 1164, 1170 (6th Cir. 1988). See also Southern Machine Co., 401 F.2d at 384.

[33] McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

[34] Id. at 223.

[35] Id. at 223-24.

far exceed the mere contractual relationship present in McGee. Not only did Mr. Boose deliver the trust agreement and codicil to Ms. Miller in Kentucky, his representation spanned several years and required routine communication with Ms. Miller and later her Kentucky beneficiary and executor. Mr. Boose received substantial payment for his legal work and for his services as trustee. Compared to McGee, these facts conclusively demonstrate a substantial connection to Kentucky and support our state's interest in providing an effective means of redress for Ms. Miller's successors. These contacts go far beyond mere solicitation as was held sufficient in McGee.

We have not overlooked Hanson v. Denckla, a case regarding the validity of a trust agreement "without any connection with the forum state."[36] In Hanson, the trustee's contact with the forum at issue came not as a result of doing or soliciting business there, but rather as a result of the settlor's decision to move there after the trust agreement had been executed. The Court held that the mere fact that the beneficiary resides in a forum state is not of itself sufficient to justify long-arm jurisdiction over the trustee. However, even Hanson suggested that if the agreement was negotiated with a settlor residing in the forum state at the time of formation of the trust, long-arm jurisdiction would be appropriate.[37] From the facts in evidence, we have no doubt that Kentucky is a reasonable forum choice. Mr. Boose admitted in his answer that the Kentucky court had personal jurisdiction over him in his individual capacity. We are unable to divide his responsibilities between attorney and trustee so as to make the distinction meaningful.

---

[36] Hanson v. Denckla, 357 U.S. 235, 254, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).
[37] Id. See Robert C. Casad, Territorial Basis and Process Limitations on Jurisdiction of State and Federal Courts, Jurisdiction in Civil Actions, 89-90 (3d ed., Vol. 1). See also Hughes Tool Co. v. Meier, 489 F.Supp. 354 (D. Utah 1977).

17

Finally, we consider the overarching <u>International Shoe</u> mandate of "fair play and substantial justice," a requirement that weighs the burden on the defendant against the benefits to the forum, the plaintiff's interest in litigating in this forum, and the judicial system's interest in obtaining the most efficient resolution of controversies.[38] Mr. Boose has conceded personal jurisdiction in his individual capacity. Regardless of the outcome of this case, Mr. Boose will have to litigate some claims in Kentucky, claims that may ultimately determine the controversy. As Mr. Boose will be already litigating associated issues in a Kentucky court, the additional burden on him due to the Kentucky forum will be modest. This additional burden does not outweigh Kentucky's interest in providing a forum for its citizens. Finally, the judicial system has a substantial interest in obtaining the most efficient resolution of controversies. As indicated, efficiency dictates resolution in one forum only. Comparing Mr. Boose's small additional burden of litigating in Kentucky with the benefits to others of litigating here, we must conclude that the assertion of personal jurisdiction would fully comport with "fair play and substantial justice."

The facts alleged by Ms. Cummings show a course of conduct by Mr. Boose beginning with his representation of Ms. Miller, continuing with his planning of her estate and trust, through his appointment as trustee of the Miller trust and culminating in alleged conflicts of interest and claims of "a scheme for acquisition of ownership" of the decedent's property. This course of conduct established the requisite minimum

---

[38] <u>Wilson</u>, 85 S.W.3d at 596. <u>See</u> <u>International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Employment</u>, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 477-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), <u>citing</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

18

contacts with the Commonwealth of Kentucky such that the Boyle Circuit Court was authorized to exercise personal jurisdiction over Mr. Boose as trustee via the Kentucky long-arm statute, KRS 454.210. Therefore, we reverse the Boyle Circuit Court and the Court of Appeals and remand this case to the trial court for further consistent proceedings.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Charles W. Curry
109 North Mill Street
Lexington, KY 40507


COUNSEL FOR APPELLEES:

Charles R. Hembree
200 West Vine Street, Suite 810
Lexington, KY 40507

Ashley W. Ward
Holly Neikirk Lankster
STITES & HARBISON, PLLC
250 West Main Street, Suite 2300
Lexington, KY 40507-1758

Kevin L. Nesbitt
P. O. Box 287
Danville, KY 40423

Ephraim Woods Helton
HELTON, ERWIN & ASSOCIATES
432 West Main Street
P. O. Box 137
Danville, KY 40423-0137